18338

*In re* ESTATE of Dewey D. GREENFIELD. Louise S. GREEN-FIELD, Temporary Administratrix, Respondent, v. Albert G. GREENFIELD, James Greenfield and Beatrice Greenfield Sorock, Individually and as Officers, Directors and/or Stockholders of Named Corporations, Appellants.

(141 S. E. (2d) 916)

*Messrs. Grier, McDonald, Todd, Burns & Bradford* and *James D. Jefferies,* of Greenwood, *for Appellants,*

*Messrs. Hinson & Hamer,* of Greenville, and *Tinsley & McGowan,* of Greenwood, *for Respondent,*

April 21, 1965.

LEGGE, Acting Justice.

Dewey D. Greenfield, a resident of Greenwood County, died on January 23, 1963, and thereafter the respondent, as his widow, filed in the Probate Court for that county her petition alleging his death intestate and praying that she be appointed administratrix of his estate. In response to the petition and the citation issued thereon the appellants appeared, denying that she was the lawful widow, and opposing her appointment as administratrix. After a lengthy hearing, the Judge of Probate issued his decree adjudging that respondent was the common-law wife and widow of the decedent and appointing her administratrix. Upon appeal to the Circuit Court that decree was affirmed by decree of the Honorable T. B. Greneker, Presiding Judge; and the present appeal followed.

The exceptions raise two issues, as follows:

1. Was the evidence sufficient to support the holding that a common-law marriage existed?

2. Did the Circuit Judge err in considering the testimony of the respondent's witness, Mrs. Janie McHenry?

Dewey D. Greenfield, generally known as "Duke", had resided in Greenwood County for some twenty years immediately prior to his death. He and certain members of his family operated the Greenwood Manufacturing Company and other affiliated corporations, the plant and offices being in the City of Greenwood. He was of Jewish faith. His home was a fine one, on the Greenwood-Laurens Highway, with spacious grounds and gardens, overlooking Lake Greenwood. About ten years before his death the respondent, then Louise Sexton, a Gentile girl who had theretofore lived with her parents in Greenwood, where her father was engaged in business, and who at one time had been employed in one of the Greenfield enterprises, moved into Duke Greenfield's home; and there they lived together, openly and continuously, until his death.

The record contains not the least hint of previous unchasity on her part. The testimony on both sides shows conclusively that during their life together she carried out with fidelity and devotion the usual duties and responsibilities of a wife, and that in their home and out of it their deportment did not in the slightest degree suggest an immoral or illegal relationship, but on the contrary was such as would be expected of a normal and happy married couple. They occupied the same bedroom and slept in the same double bed. She bought the groceries, managed the servants, drove him to and from his work, arranged their meals, and cared for him in sickness and in health. Their photographs stood on the mantel in their living room; the sign in their driveway read: "Greenfields—Private". They entertained in their home many prominent and respected married couples of Greenwood; in turn they were entertained in the homes of their married friends. But appellants contend that these outward and visible signs are belied and overthrown: (1) by the fact that in all business transactions Louise used her maiden name, and that in her application for employment in 1961 at Greenwood Mills and for that company's withholding tax records and social security information she gave her name

as Louise Sexton and stated that she was single; and (2) by Duke's statements, made in the presence of several witnesses, to the effect that he and Louise were not married and that he had no wife.

In evaluating the impact of such inconsistency between conduct and statement upon the issue here involved, consideration must be given to the probability that Louise (who did not testify) felt, as at least one of appellants' witnesses did, that her marriage was not legal because there had been no marriage ceremony, and to the fact that Duke, who was many years her senior and obviously the dominant partner, had a strange obsession concerning his surname.

Duke Greenfield is revealed by the evidence as a man well-educated, well-read, succssful in businss, and of interesting and attractive personality in the companionship of his friends, but obsessed with the idea that there persisted in this country a caste system under which all Jews were discriminated against. He felt that the name "Greenfield" marked one as a Jew and was therefore to be avoided, especially in business matters—a feeling apparently shared by his unmarried sister Sadie, who in her part in the family business operations used the name "Sadie Green", and by his brother Joseph, who went under the name of "Joe Fields". The testimony of Mr. Donald McKellar, a close friend of Duke and Louise Greenfield for many years, describes quite clearly Duke's feeling on the matter of anti-Semitism, and his view concerning his marital status. We quote at some length from Mr. McKellar's account of a discussion with Duke in the latter's home:

"* * * He was discussing the caste system and said he knew it was there and I knew it was there. He said 'I can't join country clubs because I am a Jew; I can't do this and I can't do that.' * * * I felt this was a good time to approach the subject. I said 'Duke, it is not because you are a Jew that you are not accepted, if you think you are not, but it is because you are living with a woman you are not married to. I know it is none of my business, and you can have me

shut up if you want to, but I am fond of you, and I don't want you to think ill of me to pry into your private affairs.' * * * Duke said 'It is exactly right. It is none of your business.' He said it very vehemently. I said 'Well, I know it isn't, but will you let me continue, and then I will shut up and never bring it up again?' He said 'Yes, go ahead.' I said 'In a community the size of Greenwood particularly there is a moral code that we have to live by, or we will not be accepted in that society. I have been out here a long time and I have seen you and Louise and I know that you love her and I know that she loves you. I think you are being dreadfully unfair to her by not going through a civil ceremony.' He said 'How do you know that I haven't?. How does anybody in town know whether we have or not? It is none of their damn business.' I said 'You are right. It isn't. That makes me feel a little better because I consider you as man and wife.' And he said 'Another point, you know, in South Carolina there is a law that says after a man and woman live together seven years (evidently he knew what he was talking about—I have no idea myself about the law), you are considered a common-law marriage.' I said 'Duke, do you consider Louise as your wife?' He said 'Absolutely I do.' He said 'It is nobody else's business whether she is my common-law wife, my wife by ceremony, or what not. If all of us delved into the private lives of everybody in Greenwood, you would really be amazed at what you dug out.' I said 'You are absolutely true,' I said then 'There is another law. I didn't know how old you are, but I do know how old Louise is (because her birthday happened to be several days from mine; around June 12th Duke had a birthday party for us. I knew she was a year older than I.)' I said 'You are a great deal older than Louise. Suppose you were to kick the bucket. You would be leaving her in a pretty bad situation.' He said 'Don't worry about that. As far as the law is concerned, she is my wife and has been considered so.' I believe he said 'She has been living here twelve years.' He said 'I think we have discussed this long

enough' and I said 'I think so too.' I said 'I will never bring this up again.' This was not a conversation between Duke and me private. It was all open and above board with Louise right there. I said 'Would you mind Louise going by the name of "Louise Greenfield?" He said 'Of course I wouldn't. It is perfectly all right. The only thing is she can get into any hotel in the country with the name of Sexton and there are a lot of places you can't get in by the name of Greenfield because it is a Jew.' He was bringing that class up again. He got back on conversation defending himself again, and said 'For business purposes how do you know she doesn't use that name because I would have to pay a lot more taxes.' He said 'That car we went to Augusta in—it is Louise's car.' My wife and I went with them to Augusta one Sunday and spent the day. He said 'It is in the name of "Sweetbriar" for business purposes, so,' he said 'nobody knows all these intricacies. You just shouldn't pry into anybody else's life. It is not right and you profess to be such a good Christian.' I said 'O.K., let's forget it.' So that was the end of that conversation.

Q. Did you plan to take any trip with them?

A. Yes, he wanted to take my children up around 'Ghost Town' and 'Maggie Valley' and see 'Unto These Hills', and he and Louise and my wife and I planned to go up to the mountains and do that next summer. I said 'When we do go, we are going to abide by our conversation—' 'Mr. and Mrs. Greenfield' and 'Mr. and Mrs. McKellar.'

Q. What did he say to that?

A. 'Fine, fine.' As a matter of fact, I would say 'How are Mr. and Mrs. Greenfield tonight?' Duke loved that. He was a delightful person. He was very much in favor of that. There is no question whatsoever about it in my mind."

The view that a religious or civil ceremony is essential to the validity of a marriage is usual among those whose social outlook is restricted and whose thinking is simple. *Campbell v. Christian,* 235 S. C. 102, 110 S. E. (2d) 1. Such view is also held by many better-informed persons who

personally disapprove of common-law marriage. It is also apparent in the judicial or legislative thinking of many states which do not recognize such marriage as legal. Recognition of the divergence of individual views as to the validity of common-law marriage is of importance in the evaluation of testimony in a case such as the one at bar. On the issue of reputation as to marital status the Circuit Judge construed the testimony of appellants' witnesses, to the effect that Duke and Louise Greenfield were living together unmarried, as suggesting that these witnesses had in mind the absence of ceremonial marriage, rather than the existence of a state of concubinage. Our concurrence in that view, supported by the strong presumption in favor of marriage for cohabitation, apparently matrimonial, coupled with social acceptance, over so long a period of time, 35 Am. Jur., Marriage, Section 200, is strengthened by the fact that the only one of those witnesses to whom the question was put directly testified as follows:

"Q. And the repute is that they were living there together, though not married?

A. That's correct.

Q. And by that I assume, or may I assume, you mean a ceremonial marriage?

A. I only know marriage one way, the procedure I went through to get married.

Q. What is that way?

A. When two agree to get married and apply for a license and have a minister or someone to marry them.

Q. You would refer to that then as a ceremonial marriage?

A. I only know marriage one way.

Q. And you call it a ceremonial marriage with a license and minister or some other official in the presence of witnesses?

A. Yes."

Appellants suggest that the testimony of respondent's witnesses as to reputation should be disregarded because the "reputation" to which it was directed was neither undivided nor general. A difference of opinion between some witnesses and others on that subject does not require rejection of such testimony. So long as it is directed to the prevailing opinion of the community it is entitled to consideration, though one witness may view the reputation as good and another as bad. And the requirement that the reputation be general does not mean that testimony thereabout must necessarily reflect the opinion of all people, or even of a great number of people, throughout a large area. For the "community" in such context is composed of those persons who have had the opportunity, through social or business contact, to form an opinion of the character of the person, or of the relationship, under inquiry. In a large city, for instance, it would be likely that comparatively few people would know anything about a particular resident, and that fewer still would have heard him discussed. Nor is it necessary that testimony as to reputation with respect to marital status relate solely to statements thereabout made to or in the hearing of the witness. For the prevailing opinion in that regard may be reflected as well by action as by word. A witness who has observed the attitude of the community toward the marital status under inquiry as shown by its acceptance of the couple into its society as husband and wife, or by its refusal to so accept them, is competent to testify to reputation in that regard, and is not disqualified because his testimony is founded upon observation rather than discussion.

We find no merit in appellants' contention that because the testimony of respondent's witness Mrs. Janie McHenry concerning reputation as to marital status had been stricken as incompetent by the Judge of Probate, it was reversible error on the part of the Circuit Judge to consider it. That this testimony did not influence the Circuit Judge's decision of the case is apparent from the

fact that in his very full decree, in which he discussed in detail the testimony of fifteen other witnesses for the respondent bearing on reputation as to marital status, he made no mention of Mrs. McHenry's testimony except to say, in overruling the exception charging that the Judge of Probate had erred in considering it, that it was at most merely corroborative and cumulative.

The evidence fully supports the decree under appeal; we have given careful consideration to all of it, and it convinces us, as it did both of the lower courts, that a valid common-law marriage has been proven, and that the respondent is the lawful widow of Dewey D. Greenfield.

Affirmed.

TAYLOR, C. J., and Moss, LEWIS and BUSSEY, JJ., concur.