Merrimack County Probate Court
No. 90-351

### In re ESTATE OF CLIFTON R. BUTTRICK, SR.

October 4, 1991

*McSwiney, Semple, Bowers & Wise P.C.*, of Concord (*Maureen F. O'Neil* on the brief, and *George B. Waldron, Jr.*, orally), for the Estate of Clifton R. Buttrick, Sr.

*Sulloway Hollis & Soden*, of Concord (*Warren C. Nighswander* on the brief and orally), for the petitioner, Charlene L. Miller.

JOHNSON, J. This is an appeal from a decree of the Merrimack County Probate Court (*Cushing*, J.) which found that the petitioner, Charlene L. Miller, was entitled to a spousal share of the estate of Clifton R. Buttrick, Sr., by virtue of the probate court's finding that the petitioner and the decedent were "deemed to have been legally married" as of the time of Buttrick's death. RSA 457:39. The question presented is whether there is sufficient evidence to satisfy the statute. We affirm.

The petitioner, Charlene L. Miller, and the decedent (Buttrick, also referred to as "Kip") met in late 1977 and began to date. In early 1978 they agreed to live together. For the cold weather portion of each year they shared a home, owned by Buttrick, in Loudon. During the warmer months they generally lived together in Miller's house in Meredith and Buttrick's boat house in Moultonboro, as well as at a cottage on Bear Island in Meredith owned by Miller's parents. Miller's brother estimated they spent about one-half of their time in Loudon and one-half in the Meredith, Bear Island, Winnipesaukee area. The couple lived together from 1978 until Buttrick's death on October 22, 1988, during which time they spent all but two or three nights together.

At the time the petitioner moved in with the decedent, he was suffering financial difficulties. Miller, upon moving in with Buttrick, made payments on his back taxes; and, during their years together, she paid for many of the couple's daily living expenses such as food, power, telephone, and insurance (business and personal). She also made payments on loans Buttrick owed to various banks. In total, she paid approximately three-quarters of their combined living expenses.

On or about August 17, 1987, on the occasion of a meeting of close friends following a funeral service reception, Miller and Buttrick exchanged marriage vows in front of a former Justice of the Peace. Although the parties appeared to be well aware that the ceremony was not official, Miller testified that Buttrick "was glad to do it" and that, as for her, "it made me feel happy and good. It was nice." Other witnesses testified that the ceremony reflected the couple's commitment and devotion to each other. The probate court found that Miller and Buttrick enjoyed "a close, strong, loving relationship."

The standard for our review in this case is set forth in RSA 567-A:4 (Supp. 1990) as follows: "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made." Hence we must review the record of the proceedings before the probate court to determine if the findings, as made by the probate judge, could be reasonably made, given the testimony he had before him. In reviewing this record, we are guided by the rule that "[t]he trier of fact is in the best position to measure the persuasiveness and credibility of evidence and is not compelled to believe even uncontroverted evidence." *Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 711, 519 A.2d 256, 259 (1986) (citing *93 Clearing House, Inc. v. Khoury*, 120 N.H. 346, 350, 415 A.2d 671, 674 (1980)).

The petitioner in this case asserts that she is entitled to a share of the estate of Buttrick by virtue of RSA 457:39. This statute reads as follows:

> "457:39 *Cohabitation, etc.* Persons cohabiting and acknowledging each other as husband and wife, and generally reputed to be such, for the period of 3 years, and until the decease of one of them, shall thereafter be deemed to have been legally married."

The estate does not challenge that the petitioner and the decedent cohabited and acknowledged each other as husband and wife for a period in excess of three years prior to the death of Buttrick. The

sole challenge by the estate to the probate court's finding that Charlene L. Miller and Buttrick are "deemed to have been legally married" is that the couple were "not generally reputed to be" husband and wife. New Hampshire "'does not recognize the validity of common-law marriages'" except under the circumstances set forth in RSA 457:39. *Joan S. v. John S.*, 121 N.H. 96, 98, 427 A.2d 498, 499 (1981) (quoting *Fowler v. Fowler*, 96 N.H. 494, 497, 79 A.2d 24, 27 (1951)); *see Bisig v. Bisig*, 124 N.H. 372, 375, 469 A.2d 1348, 1350 (1983).

On the sole disputed point, the probate court found, in the narrative portion of its decree, that the petitioner and the decedent "were generally known in the community where they lived and among their friends and family as husband and wife." In a specific finding requested by the petitioner, the probate court found that "Petitioner and Buttrick were generally reputed to be husband and wife for the three years leading up to the death of Buttrick on October 22, 1988." In addition, in response to requests for rulings of law, the probate court granted the following requests:

"1. Petitioner and Buttrick, by cohabitating and acknowledging each other as husband and wife and by being generally reputed to be such for the period of three years immediately prior to the decease of Buttrick, are deemed to have been legally married as of the decease of Buttrick. RSA 457:39.

2. Petitioner, as the legal spouse of Buttrick, is entitled to one-half of the intestate estate. RSA 561:1(d)."

A review of the record reveals the following testimony, which is sufficient to sustain the probate court's findings of fact and rulings of law. First, Richard Miller, brother of the petitioner, who at the time was one of the owners of the Red Hill Inn in Center Harbor, testified that Miller "referred to Mr. Buttrick as her husband. Or 'hubby,' I guess is what she called him." He further testified that "[m]y mother referred to Mr. Buttrick several times, to me, as my brother-in-law." Finally, in discussing mutual friends of the witness and of the petitioner and Buttrick (whose names were given to the probate court), all of whom frequently joined together in social events, Mr. Miller stated, "A number of them felt that, until I told them otherwise *after his death*, that they were married." (Emphasis added.) He went on, "And at least two of them that I met and have seen for the first time in two years—I've seen them in the last two weeks and they did not know of Mr. Buttrick's death, felt that they were married. They

asked how *Charlene and her husband* were." (Emphasis added.) The people he referred to were Jonathan James and Joan Christina Olitsky, both of Meredith.

Second, Joan Christina Olitsky's deposition testimony confirmed Mr. Miller's testimony. She stated, "I thought they were married soon after I met them," and she learned that they were not legally married only "when he died." She further testified that friends and family understood "[t]hat they were a couple." She continued, "I wouldn't think of inviting Charlene over to dinner without Kip . . . any more than I would invite you without your wife." Later, she stated, "To me he was her husband and they were a couple."

Third, Joan Westphal of Laconia testified, "For the first couple of months I worked at Trexler's [where Miller worked as well] I, in fact, thought that they were married." She testified that she learned at a later date through "a conversation" with Betty Trexler that "they had not gone through the traditional legal channels of marriage." She further stated that, "In fact, my roommate Susan Cohen thought that they were married, for longer than I did." The witness further testified that Miller described to her the wedding ceremony, noted above, and stated, "I felt as though she [Charlene Miller] took it very seriously and it meant very much to both of them."

Fourth, Miller and Buttrick received mail at their home addressed to "Kippy and Charlene Buttrick" and to "Kip and Charlene Buttrick." Finally, the probate court granted the following requests, which are supported by a review of the record:

> "Even though Petitioner and Buttrick knew they were not legally married in the eyes of the law, they acknowledged their relationship to be that of husband and wife, conducted themselves as such and held themselves out to the public as such . . . .
>
> Several people testified that Petitioner and Buttrick lived together as husband and wife and were reputed as such by their friends, family and acquaintances . . . ."

■ Based on a review of the record, we hold that the findings of the probate court, particularly the finding that "Petitioner and Buttrick were generally reputed to be husband and wife for the three years leading up to the death of Buttrick on October 22, 1988," are

not "plainly erroneous" and clearly could be "reasonably made." RSA 567-A:4 (Supp. 1990).

*Affirmed.*

THAYER, J., with whom BROCK, C.J., joined, dissented; the others concurred.

THAYER, J., dissenting: The legal questions before us are how a community reputation is established and, more specifically, whether, utilizing a *"plainly erroneous"* standard, the trial record supports the probate court's determination that the petitioner and Mr. Buttrick were generally regarded in the community to be husband and wife. Because I disagree with my colleagues that the evidence supports a finding that the petitioner and decedent were reputed to be husband and wife, *i.e.* married, I must respectfully dissent.

Since the issue presented is fact-based, a summary of the trial evidence and findings of the probate court is necessary. It is clear, after reviewing the record, that the petitioner and Mr. Buttrick lived in Loudon during the winter and alternated among three locations on Lake Winnipesaukee during the summer. The uncontroverted evidence from family members was that they knew the petitioner and decedent were not married. It is also clear that all the witnesses from Loudon testified they knew Mr. Buttrick was not married. The record also shows that other witnesses, who had been present for a mock wedding ceremony which occurred fourteen months before Mr. Buttrick's death, testified that at least from that time forward they knew that the petitioner and decedent were not married. Karen Beyerly, a summer resident of Bear Island, testified that she considered the petitioner her best friend and that she knew the petitioner and the decedent were not married. Bill Rooney, who has a summer home on Lake Winnipesaukee, testified he also knew the petitioner and the decedent were not married.

Joan Westphal, a co-worker of the petitioner, testified that for the first few months she worked with the petitioner she thought the petitioner was married, but that she then found out from their employer that the petitioner was not married. Joan Westphal further testified that her roommate thought the petitioner and Mr. Buttrick were married for an even longer period than she did. For exactly how much longer, the record is silent.

The testimony and evidence favorable to the petitioner's position, cited by my colleagues in upholding the probate court's finding, included testimony of Richard Miller, petitioner's brother, and of Joan

Christina Olitski. Richard Miller testified that while he knew his sister and Mr. Buttrick were not married, he knew a number of persons in the community who thought they were. Joan Olitski was the only one to offer first-hand evidence, however. She stated, by deposition, that she was a summer resident of Bear Island and kept her boat where petitioner worked. She further testified that petitioner had introduced the decedent to her as someone important to her, that petitioner never said the decedent was her husband, and that Olitski never noticed a wedding ring or any other indicia of marriage. She testified that, nevertheless, she thought they were married because they lived together. The only other evidence cited by the majority in support of the petitioner's position is two Christmas cards sent by Dave Piper, who was not further identified and did not testify, one in October 1987 and the other in December 1987. Mr. Piper addressed the envelopes to "Kippy and Charlene Buttrick." It is clear that both cards were sent within one year of Mr. Buttrick's death, but it is impossible to determine from the record whether Mr. Piper actually believed the petitioner and decedent to be married and, if so, whether he had believed it for a period of three years before Mr. Buttrick's death.

Reputation, as an element of common-law marriage, should be generally known and undivided in the appropriate community. *See In re Manfredi's Estate*, 159 A.2d 697, 700 (Pa. 1960) (reputation must be broad and general, not partial and divided); *see also Walter v. Walter*, 433 S.W.2d 183, 195 (Tex. Civ. App. 168); 52 AM. JUR. 2d *Marriage* § 52, at 907 (1970). "'The mere fact that they [the alleged contracting parties] were known to a few people as man and wife is not sufficient evidence to establish marriage. Proof of reputation for such purpose must be general and not confined to a few persons in the immediate neighborhood, as the relationship may be established merely for the purpose of deceiving others.'" *In re Manfredi's Estate*, 159 A.2d at 700 (quoting *In re Hilton's Estate*, 263 Pa. 16, 19, 106 A. 69, 70 (1919)). "[T]he community in such context is composed of those persons who have had the opportunity through social or business contact to form an opinion of the character of the person, or of the relationship, under inquiry." *In re Greenfield's Estate*, 141 S.E.2d 916, 920 (S.C. 1965); *see also Commonwealth v. Stump*, 53 Pa. 132, 135 (1866) (reputation consists of the speech of the people who have had an opportunity to know the parties).

The probate court, in reaching its determination of community reputation, must have concluded that not everyone in the community who knew the individuals and had an opinion as to their reputation

had to agree unanimously or even to reach a general consensus on what that reputation was. The court also had to have concluded that the personal beliefs of the petitioner's and decedent's family, friends, neighbors, and business associates were outweighed by the testimony of the petitioner's brother, which was that some individuals thought the petitioner and the decedent were married, along with the testimony of a person who was in the community for only three months a year, and evidence of two Christmas cards, addressed to the petitioner and the decedent. The evidence does not support, as reasonable, the latter conclusion, and I would find plain error and reverse. Today's holding should be noted by those unmarried persons who are living with someone in a "loving relationship," but who do not want their companions to share in their estates.

BROCK, C.J., joins in the dissent.