Rockingham County Probate Court
No. 2007-435

IN RE ESTATE OF DAVID J. BOURASSA

Argued: March 20, 2008
Opinion Issued: June 3, 2008

*Chubrich & Harrigan, P.A.*, of Portsmouth (*Michael E. Chubrich* on the brief and orally), for the petitioner.

*Boynton, Waldron, Doleac, Woodman & Scott, P.A.*, of Portsmouth (*Francis X. Quinn, Jr.* and *Amy C. Mackin* on the brief, and *Mr. Quinn* orally), for the Estate of David J. Bourassa.

DUGGAN, J. The petitioner, Deborah Beck, appeals a decree of the Rockingham County Probate Court (*O'Neill*, J.), which found that she is not entitled to a spousal share of the estate of David J. Bourassa. Beck argues that the trial court erred in failing to find that she was Bourassa's common law spouse pursuant to RSA 457:39 (2004). Because the probate court reasonably held that Beck and Bourassa failed to acknowledge one another as husband and wife, as is required by RSA 457:39, we affirm.

The probate court found the following: Beck and Bourassa began a romantic relationship at some point during the mid to late 1990s. Soon thereafter, Bourassa moved into Beck's home, where he continued to reside until his untimely death in August 2006. During those years, the couple shared domestic responsibilities, worked together on Beck's family farm, and, in 2002, gave birth to a child. However, despite their lengthy cohabitation, the couple never married.

Following Bourassa's death, his most recent will was submitted for probate. That will, which was duly executed several years after the couple began cohabiting, made no provision for Beck. Instead, it provided that the entirety of Bourassa's estate was to be divided equally among his four daughters from a previous marriage. Believing that she was nevertheless entitled to a spousal share of Bourassa's estate, *see* RSA 561:1 (2007), Beck filed a petition in the probate court requesting to be declared Bourassa's common law spouse.

"New Hampshire is a jurisdiction which does not recognize the validity of common-law marriages except to the limited extent provided by RSA 457:39." *Joan S. v. John S.*, 121 N.H. 96, 98 (1981) (quotation omitted); *see In re Buttrick*, 134 N.H. 675, 677 (1991). Pursuant to that statute, which has been in substantially the same form since 1842, "[p]ersons cohabiting and acknowledging each other as husband and wife, and generally reputed to be such, for the period of 3 years, and until the decease of one of them, shall thereafter be deemed to have been legally married." RSA 457:39. Accordingly, to be entitled to a spousal share, Beck was required to demonstrate that, for the period of three years preceding his death, she and Bourassa: (1) cohabited; (2) acknowledged each other as husband and wife; and (3) were generally reputed to be husband and wife in their community. *See Delisle v. Smalley*, 96 N.H. 58, 59 (1949).

Following two days of hearings, the probate court issued its final order and ruled that Beck had presented sufficient evidence to demonstrate that she and Bourassa had cohabited for the three years preceding his death. However, the court determined that Beck had failed to sustain her burden of establishing that she and Bourassa acknowledged one another as

husband and wife, and were generally reputed as such in the community. Accordingly, the probate court refused to rule that Beck was entitled to a spousal share of Bourassa's estate.

Beck appeals, arguing that the trial court erred in finding both that she and Bourassa did not acknowledge each other as husband and wife, and that she and Bourassa were not generally reputed to be husband and wife in their community. In addressing Beck's claim, we must accept "[t]he findings of fact of the judge of probate a[s] final unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (2007). "Hence we must review the record of the proceedings before the probate court to determine if the findings, as made by the probate judge, could be reasonably made, given the testimony" presented at trial. *In re Buttrick*, 134 N.H. at 676. When engaging in this inquiry, we are guided by the rule that "[t]he trier of fact is in the best position to measure the persuasiveness and credibility of evidence and is not compelled to believe even uncontroverted evidence." *Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 711 (1986); *see also Cook v. Sullivan*, 149 N.H. 774, 780 (2003) (explaining that the trial court is in the best position to "resolv[e] conflicts in the testimony, measur[e] the credibility of witnesses, and determin[e] the weight to be given evidence").

After reviewing the record, we hold that the probate court's finding that Beck and Bourassa did not acknowledge each other as husband and wife is reasonable, based upon the evidence presented at trial. As we have previously explained, "[a]cknowledgement of another as one's spouse [under RSA 457:39] involves declaration or avowal of the relationship." *Delisle*, 96 N.H. at 59; *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 151 (unabridged ed. 2002) (defining "avowal" as "an open declaration or frank acknowledgement"). In other words, "[t]he conduct of cohabitation assumes at death the aspect of legality or illegality, according [to whether] the declarations of the parties which accompanied that conduct have avowed or disavowed the existence of a *legal relationship.*" *Delisle*, 96 N.H. at 59-60 (emphasis added).

Here, as the probate court noted, the majority of witnesses testified that Bourassa did not acknowledge Beck as his wife. For example, one of Bourassa's former employers, Michael Iafolla, testified that he saw Bourassa with the couple's child, asked him if he had gotten married, and Bourassa responded firmly, "hell, no." Bourassa's brother, Gary Bourassa, testified that Bourassa never held Beck out as his wife and, in fact, had made a point to tell him that "they were not married." Bourassa's sister, Gail Jablonski, believed that Beck was just "the woman [her] brother lived with" and testified that her brother would "always say anybody was crazy

that got married." Finally, five of Bourassa's former employees, as well as one of his former business associates, similarly testified that he never held Beck out as his spouse.

The record also supports the trial court's conclusion that Beck did not acknowledge Bourassa as her husband. Indeed, two of Bourassa's daughters, Dayna and Devin Bourassa, testified that Beck had sternly told them that she was not, and never would be "anybody's common law." Moreover, the executor of Bourassa's estate, Richard Sullivan, testified that he spoke with Beck regarding her petition to obtain a spousal share, at which time she stated that "she was never David's wife and she would never be anybody's wife." According to Sullivan, Beck went on to explain that she associated the word "wife" with "servant" and refused to "be anybody's servant . . . [or] anybody's wife."

Despite the couple's express disavowal of their relationship as husband and wife, Beck argues that we must reverse because the probate court "erred by ignoring an entire category of evidence: the actions of [Bourassa] and [Beck], which [she contends] consistently acknowledged [her] as his wife, and he as her husband." We disagree.

Although, in rare cases, the conduct of the parties could conceivably rise to the level of an avowal of "the existence of a legal relationship," *Delisle*, 96 N.H. at 60, this is not such a case. To be sure, many of Beck's witnesses testified that the couple shared domestic and child care responsibilities. However, as the probate court stated in its order, Beck also "identified herself on her will . . . as a single person," maintained separate bank accounts from Bourassa, and described Bourassa as her "significant other" in answering interrogatories propounded in unrelated litigation. Moreover, when a newspaper article written about her family farm referenced Bourassa as her spouse, Beck testified that she "spoke to [the author] . . . [and] told her that [Bourassa] and [she] weren't legally married."

■ Beyond that acknowledged in the probate court's order, the record also reveals that Beck and Bourassa held their real estate separately, titled their vehicles separately, and had separate health insurance. Further, three months prior to his death, Bourassa completed an intake form while visiting a chiropractor and, although he responded to every other question, left the box for spouse blank. In light of all of the foregoing conduct, we cannot hold that the probate court's finding that the couple did not acknowledge one another as husband and wife is "so plainly erroneous . . . [that it] could not be reasonably made." RSA 567-A:4; *see also Restaurant Operators, Inc.*, 128 N.H. at 711 (explaining that it is within the purview of the trial court to weigh the evidence).

Beck also argues that the trial court erred "by relying upon [*Tapley v. Tapley*, 122 N.H. 727, 730 (1982),] to deny . . . her [a] spous[al] share of [Bourassa]'s [e]state." Specifically, Beck contends that *Tapley* did not arise under RSA 457:39 and, thus, the probate judge "improperly and incorrectly equated the lifetime dissolution of the Tapley's 'unstructured domestic relationship,' with the termination of [Bourassa]'s and [Beck]'s loving relationship by [Bourassa]'s untimely death." Beck overstates the trial court's dependence upon *Tapley.*

■ As noted by the Estate, the court's "reliance" upon *Tapley* is limited to a single citation in the conclusion section of its order. Preceding that section are several pages of factual findings that independently support the probate court's ultimate determination that Beck failed to meet her burden. Even more to the point, the probate court cited *Tapley* with the signal "*cf.*" Meaning literally "compare" or "see, by way of comparison," THE CHICAGO MANUAL OF STYLE § 16.58, at 607 (Univ. of Chi. Press, 15th ed. 2003), the "*cf.*" signal is used to show that a "[c]ited authority supports a proposition *different* from the main proposition but sufficiently *analogous* to lend support," THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION § 1.2 (Columbia Law Review Ass'n *et al.* eds., 17th ed. 2000) (emphases added). For these reasons, even assuming without deciding that it was error for the court to cite *Tapley* in this context, contrary to Beck's suggestion, it is apparent that that citation did not affect the court's analysis. *See McIntire v. Lee*, 149 N.H. 160, 167 (2003) (explaining that "[a]n error is considered harmless if it is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party asserting it").

Having determined that the probate court correctly ruled that Beck and Bourassa did not acknowledge each other as husband and wife, we need not address the court's further finding regarding the couple's reputation in the community. *See Delisle*, 96 N.H. at 59. Because the majority of Beck's remaining arguments are either concerned with that finding, or amount to little more than a request that we reweigh the evidence, *see Restaurant Operators, Inc.*, 128 N.H. at 711, we decline to address them.

■■ Beck's counsel has made one further charge, however, the severity of which compels discussion. In his brief and at oral argument, counsel accused the probate judge of inattentiveness, bias and confusion. We have thoroughly reviewed the record and have found no evidence to support this assertion. Instead, the record reveals a judge who was attentive and engaged in the trial proceedings; on numerous occasions posed questions to the witnesses; and, at least twice, was required to remind the petitioner's counsel of the questions he had previously asked. That the probate judge was acutely aware of both the facts and law is further evidenced by her

comprehensive, well reasoned order. While it is inherent in our appellate function to review and evaluate such claims against trial judges, when, as here, the claims are utterly baseless, they are inconsistent with the professionalism we expect from practitioners before this court. *See* NEW HAMPSHIRE BAR ASSOCIATION, THE NEW HAMPSHIRE LAWYER PROFESSIONALISM CREED (April 4, 2001), *available at* http://www.nhbar.org/legallinks/nh-professionalism-creed.asp (explaining that a New Hampshire lawyer "displays respect for clients, judges, court staff, opposing counsel and all participants in the process" and "understands differing viewpoints"). Practitioners would be wise to raise such accusations in the future only when they are warranted, and not merely where they result from dissatisfaction with the trial court's decision.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.