RENOVEST COMPANY

v.

HODGES DEVELOPMENT CORPORATION

December 6, 1991

*Upton, Sanders & Smith,* of Concord (*Gilbert Upton* and *James F. Raymond* on the brief, and *Mr. Upton* orally), for the plaintiff.

*Cleveland, Waters and Bass P.A.,* of Concord (*Craig L. Staples* on the brief, and *Roger Burlingame* orally), for the defendant.

HORTON, J. The plaintiff has taken appeal from the Superior Court's (*Dickson,* J.) order granting the defendant's motion to dismiss made at the close of the plaintiff's case during a jury-waived trial. Two questions are raised on appeal: (1) by what standard should we review the evidence when a judge grants a motion to dismiss during a jury-waived trial; and (2) whether the court erred in its findings and in its order of dismissal based thereon. We find no errors and affirm.

The plaintiff, Renovest Company (Renovest), entered into a purchase and sale agreement with the defendant, Hodges Development Corporation (Hodges), on June 30, 1986, for a two-building apartment complex in Franklin. The agreed-upon purchase price was $1,476,000 and the initial deposit paid to Hodges at the signing of the contract was $65,000. The contract specified that the deposit would serve as liquidated damages if Renovest failed to close on or before September 3, 1986.

Three conditions precedent to the buyer's obligation to perform were contained in the contract. At issue here are paragraph 3(b), relating to physical inspection of the property, and paragraph 3(d) relating to the buyer's obtaining financing at certain rates and terms. No portion of the contract stated expressly that time was of the essence. The provision relating to inspection called for the inspection to be completed within fourteen working days, and specified that if the inspection was unsatisfactory, the "Buyer shall have three (3) days from the date of completion of such inspection in which to notify Seller of his disapproval, and this Agreement shall be null and void and all deposits hereunder shall be refunded in full." The outside date on this condition was July 24. The financing provision contained a forty-five-day limit, after inspection of the seller's business records, in which the buyer was required to notify the seller of an intention to invoke the financing condition clause. Paragraph 9 of the contract required that all notices be given in writing.

Renovest first inspected the buildings on July 10, 1986, sending a partner and a building inspector. It was during this inspection that Renovest discovered a crack in the exterior of one building, and it consulted with Hodges the next day. Whether Hodges agreed to extend the deadline in order to allow further inspection by Renovest is disputed. Further investigation was performed on July 17 and 23 by another engineer, and his report on August 6 contained his opinion that the building would require "underpinning" of the foundation in order to prevent further settling of the building. Underpinning involves stabilization of the building's foundation. Based on this report, Renovest wrote to Hodges on August 7, terminating the transaction and demanding return of the $65,000 deposit. Hodges undertook its own engineering study, which commenced with borings on August 12 and culminated in an evaluation report dated August 26. This report described the cracking as cosmetic, found the problem building structurally sound, and rejected the need for underpinning. Hodges shared this report with Renovest.

Renovest did initially undertake to secure the financing by approaching four banks. Two of these, the Bank of New England and the Shawmut Bank, were favorably disposed toward the financing application, up to the time that Renovest notified them of the results of the engineer's report about the building's structural problems. Upon receipt of this information, the banks indicated they would not continue to process the loan applications until the issue of the building's structural soundness was resolved. Although time still remained in which to meet the financing deadline, Renovest never

pursued the applications further. A second letter sent by Renovest to Hodges on August 12 asserted the failure to obtain financing, as well as an unsatisfactory result of the inspection of Hodges's books and records, as additional grounds for the termination of the contract. Renovest no longer asserts the books and records contingency as a ground for the termination.

At trial on its suit to obtain return of its deposit, Renovest presented three witnesses and introduced the deposition of a fourth witness. After Renovest rested, Hodges moved to dismiss, both orally and in writing, and the judge granted the motion based on the court's findings of fact. Rather than making a determination of whether the plaintiff established a *prima facie* case, the judge specifically concluded that Renovest's objection to the building's structure was untimely, and that Renovest prematurely terminated its attempts to obtain financing. He therefore ruled that the plaintiff had failed to carry its burden of proof, and granted the defendant's motion to dismiss. Renovest appeals the findings of the court, and asserts that, viewing the evidence presented to the judge in the light most favorable to it, Renovest had met its initial burden of presenting a *prima facie* case.

## I. *Standard of Review*

In most circumstances, the appropriate standard of review for a motion to dismiss (or nonsuit) is to take the evidence presented and determine if, viewed most favorably to the non-moving party, it establishes a *prima facie* case. *Morrill v. Tilney*, 128 N.H. 773, 777, 519 A.2d 293, 295 (1986). This standard has previously been applied, at least in one instance, in a bench trial case. *See Auclair v. Bancroft*, 121 N.H. 393, 395, 430 A.2d 169, 171 (1981).

The defendant, Hodges, urges that, although it would prevail under either standard, this court should adopt a standard recognizing that when the judge is the trier of fact, that judge may make findings of fact at the close of the plaintiff's case, which findings are entitled to deference upon review, unless clearly erroneous.

In *Auclair*, a case appealed from an order issued during a jury-waived trial at the same trial juncture as the present case, we applied the standard of viewing all evidence in the light most favorable to the plaintiff. *Auclair supra. Auclair* arose in a different procedural setting from the case before us today. Rather than dismissing the case on the basis of findings of fact made against the plaintiff, as in the present case, the trial judge in *Auclair* declined to make findings of fact at the close of the plaintiff's case, and instead chose to hear the

defendant's case. Indeed, the trial judge ultimately made findings of fact in favor of the plaintiff. *Id.* In reviewing the decision not to make findings of fact, we applied the standard of a *prima facie* case to justify having the case proceed, as we had no findings of fact to review. If faced with a *prima facie* case presented by the plaintiff, and if uncertain as to the propriety of making factual findings from the evidence, the trial judge, acting without a jury, certainly has the discretion to require the defendant to proceed. If the defendant is secure in its assessment of the evidence, it may rest its case.

Our standard of review is a common-law, court-developed, doctrine based upon a weighing of the benefits of an expedited trial, and the resulting judicial efficiencies, against the risk of losing what might be developed in extended proceedings. As a court-developed doctrine, an appropriate standard may be established by this court in circumstances where no separate trier of fact exists and we are not, therefore, obligated to preserve a separate prerogative. *See Briere v. Briere*, 107 N.H. 432, 434, 224 A.2d 588, 590 (1966); *Dean v. Smith*, 106 N.H. 314, 317, 211 A.2d 410, 412–13 (1965).

We believe the better view is that supported by Hodges. The purpose behind the highly deferential *"prima facie"* standard for evaluating the plaintiff's evidence is to permit the issue to go to the jury if it is possible for the jury to resolve the issue in the plaintiff's favor, to preserve all factual matters that reasonably might be determined against the moving party. *See Page v. Parker*, 43 N.H. 363, 366 (1861). Therefore, the issue must go to the jury upon the presentation of a *prima facie* case, regardless of the judge's view of the weight of the evidence. R. WIEBUSCH, 5 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 1585, at 298 (1984).

A motion to dismiss, made to the judge in a jury-waived trial at the close of the plaintiff's case, can challenge the plaintiff's case in either of two ways. Although both types of motion are referred to as "motions to dismiss" in many jurisdictions, they serve two very separate purposes. One, directed at the judge in his role as judge, is used to assess the legal sufficiency of the case, and is measured by the familiar *prima facie* standard, taking all evidence introduced and resolving all conflicts in the plaintiff's favor. The second, however, is a broader one, asking the judge, as the trier of facts, for an expedited disposition. On such a motion, the judge is permitted to render a verdict for the defendant, on the merits, at the close of the plaintiff's case. Should the judge choose to address the case on the merits at that time, the judge should make findings of fact and assess whether

the plaintiff has carried his or her burden by a preponderance of the evidence.

The plaintiff has had the chance to prove his or her case, tested by cross-examination, but unchallenged by the defendant's case-in-chief. The plaintiff has no right to rely on the defendant's witnesses or exhibits to supply essential elements of his or her case. An alert defendant, perceiving a fatal hole in the plaintiff's case or satisfied with the state of the record, may rest without putting on a case. The plaintiff has no right to require the defendant to proceed. On the other hand, the defendant should be allowed to test the sufficiency of the plaintiff's proof before making the decision to proceed.

In a case where the judge is also serving as the trier of fact, the judge can halt the trial at the close of the plaintiff's case when he or she determines that the facts, as presented, will not be sufficient to meet the burden of establishing the case. The judge need not review the evidence by the *prima facie* standard to see if the plaintiff *might* meet the burden, based on possible findings of fact, but rather, as the trier of fact, can evaluate whether the plaintiff has actually met the burden to the court's satisfaction. The "prima facie case means little or nothing in a case tried to the court where it is clear, as it is here, that the trial court has weighed the evidence and found that the [claim] was not established." *Totem Equip. Co. v. Critchfield Log. Co.*, 62 Wash. 2d 175, 178, 381 P.2d 738, 739 (1963). "[T]he trial court was the trier of the facts, and in considering the evidence was not bound to view it in a light most favorable to the plaintiff, with all attendant favorable presumptions, but was bound to take an unbiased view of all the evidence, direct and circumstantial, and accord it such weight as he believed it entitled to receive." *Allred v. Sasser*, 170 F.2d 233, 235 (7th Cir. 1948). Quite simply, if the trial judge determines that the plaintiff has failed to present evidence which may persuade the judge at the close of the case, by a preponderance of the evidence, no need exists to hear the case in defense.

■■ This standard of review has been adopted in whole or in part in the procedural rules of many States. *See, e.g., Teodonno v. Bachman*, 158 Colo. 1, 4, 404 P.2d 284, 285 (1965); *Warner Corporation v. Magazine Realty Co.*, 255 A.2d 479, 481 (D.C. 1969); *Pichulik v. Air Conditioning & Heating Service Co.*, 123 Ga. App. 195, 196–97, 180 S.E.2d 286, 288 (1971); *Grieser v. Haynes*, 404 P.2d 333, 335–36 (Idaho 1965); *Neasham v. Day*, 34 N.C. App. 53, 55, 237 S.E.2d 287, 288 (1977). It has also been applied by courts in States where the rules of civil procedure do not include it. *See N. Fiorito Co. v. State*,

69 Wash. 2d 616, 618–19, 419 P.2d 586, 588 (1966). We hold that when the trial judge is sitting as the trier of fact, he or she appropriately may make findings of fact at the close of the plaintiff's case-in-chief, and may use such facts to determine whether the plaintiff has established the case by a preponderance of the evidence. On appeal, we will not overrule these findings of fact, unless they are clearly erroneous, nor will we reverse the dismissal based thereon unless it is inconsistent with the findings or otherwise contrary to law.

## II. *Time of the Essence*

In his order dismissing the complaint, the trial judge found that time was of the essence for the exercise of the rights under the conditions precedent. The judge based his conclusion on the strict time provisions applicable to performance of the conditions, concluding that these provisions required strict compliance with the timetables established. The court therefore determined that the late notification precluded the plaintiff's invoking its right to terminate the agreement under the physical inspection condition. The court apparently also determined that no waiver of the deadline occurred during the relevant period.

█ Renovest correctly asserts that ordinarily time is not made of the essence in a contract, absent some indication that the parties intended otherwise. *Moore v. Sterling Warner Indus. Inv. Corp.*, 114 N.H. 520, 522, 323 A.2d 581, 583 (1974). The mere fact that a date is stated in the contract is not sufficient, by itself, to alter this rule. *Id.* Renovest argues that the issue must be resolved based on the evidence adduced at trial up to the point of the judge's dismissal, and that none of this evidence established that time was of the essence. Citing *Allard & Geary, Inc. v. Faro*, 122 N.H. 573, 448 A.2d 377 (1982) (evidence that word "before" was inserted by closing date, as well as that defendant orally informed buyer that time was crucial), Renovest asserts that the trial judge incorrectly applied our precedents to find sufficient indicia of such intent.

██ Renovest's argument is inapplicable in the present case, because the terms involved are express conditions precedent. The plaintiff's duty to perform under the contract was made "subject to" performance of these conditions. Where "the occurrence of a condition is required by the agreement of the parties, rather than as a matter of law, a rule of strict compliance traditionally applies." E.A. FARNSWORTH, CONTRACTS § 8.3, at 544 (8th ed. 1982); *see also* 5 S. WILLISTON, CONTRACTS § 669 (3d ed. 1961). The reasoning behind

this rule is that when the parties expressly condition their performance upon the occurrence or non-occurrence of an event, rather than simply including the event as one of the general terms of the contract, the parties' bargained-for expectation of strict compliance should be given effect. Therefore, absent waiver or extension by the defendant, written notification of disapproval of the building inspection was required to be given by Renovest no later than July 24. *Lemay v. Rouse*, 122 N.H. 349, 351–52, 444 A.2d 553, 555 (1982). The trial court's finding of absence of timely compliance with the building inspection condition is correct.

### III. *Waiver of Terms*

Renovest further argues that the express condition's deadline for notification was waived by Hodges in the July 11 phone conversation. During this conversation, Hodges's vice president, Barry Sanborn, agreed with Renovest's suggestion that Renovest hire a structural engineer to conduct further inspection. Renovest takes this approval to be a waiver of the notification time limit. We disagree.

A finding of waiver must be "based upon an intention expressed in explicit language to forego a right, or upon conduct under the circumstances justifying an inference of a relinquishment of it." *Kilgore v. Association*, 78 N.H. 498, 502, 102 A. 344, 346 (1917). A waiver may be express or implied. Renovest does not assert an express waiver.

Whether an implied waiver occurred is a question of fact, and we will not overturn the trial judge's determination that no waiver occurred, unless such finding is clearly erroneous. *See D.M. Holden, Inc. v. Contractor's Crane Serv., Inc.*, 121 N.H. 831, 834, 435 A.2d 529, 531 (1981). Thomas Sheedy, one of the partners in Renovest, testified at trial that Hodges's acquiescence in the follow-up inspection left him with the impression that he would get an extension of time. Although Renovest did introduce evidence that Hodges suggested the hiring of a structural engineer, Hodges responds that this suggestion does not show an intent to extend the time limit, because there were still ten days remaining in which the inspection could be accomplished.

All the evidence presented by Renovest does not compel the trier of fact to believe the assertion that a waiver occurred. *See 93 Clearing House, Inc. v. Khoury*, 120 N.H. 346, 350, 415 A.2d 671, 674 (1980). The trier of fact may simply choose to disbelieve a witness. *See id.* The judge could have based his conclusion on the cross-examination of Mr. Sheedy, which went as follows:

"Q. Are you telling us that Hodges told you that the termination deadline of paragraph 3-B was being waived?

A. When I made my inspection, they agreed I'd get a structural engineer after July 10th.

Q. They agreed you would get a structural engineer after July 10th?

A. Yes.

Q. They told you that?

A. Yes.

. . .

Q. That is not the same thing as saying we agreed to extend the deadline date under paragraph 3-B.

A. I took it to mean there was an extension.

Q. Did anyone say there was an extension of the termination date under 3-B?

A. Not in writing.

Q. Did they say it verbally?

A. They said we were allowed to go get a structural engineer.

Q. You have told us that, but did they tell you you were allowed to extend the time to terminate it?

A. No.

Q. And you never did request an extension in writing, did you?

A. No, I asked them for it.

Q. You never got an extension in writing.

A. I didn't get it in writing."

The contract that the parties agreed to recited that "this Agreement may not be changed orally, but only by an agreement in writing, duly executed by or on behalf of the party or parties against whom enforcement or any waiver . . . is sought." No writing invoking the physical inspection termination condition was sent until August 7.

■ As it was Renovest's duty to establish a waiver, the judge was not obligated to wait for credible evidence that no waiver occurred. Viewing this evidence, we cannot conclude that the trial judge's finding was clearly erroneous.

## IV. *Financing Condition*

Renovest asserts that it was unable to obtain financing for the project and, therefore, was excused from performing by paragraph 3(d). That paragraph, under the heading "Conditions Precedent to Buyers [*sic*] Obligation to Perform," reads:

> "d. This Agreement is subject to Buyer obtaining a written commitment for First Mortgage financing from a lending institution with the following terms. . . . The commitment to be obtained within 45 days from the date of Buyers [*sic*] receipt of the books and records. Buyer shall notify Seller in writing within 45 days from review of the books and records of his intention to exercise the right to terminate this Offer under this mortgage contingency clause."

We also reject Renovest's reliance upon this provision.

 Under New Hampshire law, every contract contains an implied covenant of good faith performance and fair dealing. *Seaward Constr. Co. v. City of Rochester*, 118 N.H. 128, 129, 383 A.2d 707, 708 (1978). Reasonable efforts must be undertaken to secure financing. *Lach v. Cahill*, 138 Conn. 418, 422, 85 A.2d 481, 482 (1951). While initially Renovest met this duty, by initiating the loan process, its later conduct supports the trial judge's finding that performance of the agreement was not excused by Renovest's inability to obtain financing. Renovest asserts that it sought the financing required under the contract, but after making the lending institutions aware of the purported construction deficiencies, it assumed that financing would be unavailable.

 The question whether any structural defects were material to financing rested solely with the banks. Having undertaken to secure financing, Renovest was committed to affirmatively seeking such financing, with activity "reasonably calculated to obtain the approval by action or expenditure not disproportionate in the circumstances." *Stabile v. McCarthy*, 336 Mass. 399, 404, 145 N.E.2d 821, 824 (1957). Reasonable efforts by Renovest were required to determine and communicate the accurate status of the observed building flaws. The evidence showed that the engineering report reflecting absence of structural defects was not shared with the interested banks. The record lends ample support to the trial court's finding that Renovest's attempts to secure financing were terminated prematurely.

The ultimate determination of whether to provide financing is one for the lender, and Renovest's unilateral belief that financing would

be unavailable due to the structural defect is insufficient to excuse it from performing under the financing condition. If Renovest felt an obligation to provide the banks with information about the structure, then it should provide *all* information it had. It cannot choose to release information selectively. While this does not impose a duty to misrepresent information submitted to the lenders, *see Trading Co. v. Jensen*, 200 Va. 744, 749, 107 S.E.2d 441, 444 (1959), there is an obligation to provide credible information supporting its application. Such information was in the applicant's hands, indicating that the structure was sound. There was no evidence presented that financing would be unavailable from the banks had they, in the words of *Stabile*, "been afforded opportunity to examine a more skillfully prepared plan, reasonably adjusted to meet the problems encountered during its preparation." 336 Mass. at 406, 145 N.E.2d at 825. Provided the lender's requests for information are reasonable, there is an obligation on buyers to seek approval, even if they, themselves, believe the effort to be futile. Use of the information in the financing decision is determined by the lending banks.

Applying these considerations to the record before us, we conclude that the trial judge could have determined that Renovest failed to make a good faith effort to secure financing and prematurely terminated its loan application effort. The question of the reasonableness of such effort is for the trier of fact to decide. *See Allview Acres v. Howard*, 229 Md. 238, 244, 182 A.2d 793, 796 (1962). The record discloses that both the Shawmut Bank and the Bank of New England indicated they were "favorably disposed" to going forward with the loan, provided the structural problem was resolved as not being severe. This falls short of showing that an appropriate application, accompanied by all available information, would have been rejected or have been an empty gesture. *Stabile*, 336 Mass. at 406, 145 N.E.2d at 825. The deposition of Shawmut's loan officer, introduced into evidence, succinctly shows the dilemma of the bank. In responding to a question on whether the bank had undertaken an investigation of the structural questions, the loan officer responded:

"A. . . . I might have been tempted to have, were we really interested in doing the loan, have the bank commission a separate engineering study using someone of our choosing.

Q. Did you go to that stage?

A. No, because I think it was clear to me that—well, for two reason[s]: one, I think the borrowers were having some questions themselves about whether they wanted to proceed based on their own engineering report, and if they're questioning it there's no point in me having the bank involved at that point. That's why I said that they should do their best to resolve the issue, and then if they wanted to re-present it, they could, but they didn't."

Based on this evidence, the trial judge could have concluded that Renovest failed to make reasonable efforts to obtain the loan, and further concluded, as did the loan officer, that Renovest did not really wish to proceed with the loan process. Although Renovest concluded that the banks would not give financing, based on its own engineer's report, the fact that Renovest was aware of Hodges's engineering report stating that the building was structurally sound, and yet did not submit this in support of its application, could support a conclusion that Renovest did not use all reasonable efforts to obtain financing.

The fact finder below reasonably could have reached the conclusion that Renovest could not invoke the financing contingency because it prematurely ceased its efforts to secure financing.

*Affirmed.*

BROCK, C.J., and JOHNSON, J., did not sit; the others concurred.