**In re STAFFORD'S IN THE FIELD, INC., Debtor.**

**Bankruptcy No. 94–12824–MWV.**

United States Bankruptcy Court,
D. New Hampshire.

Jan. 18, 1996.

H. Edward McBurney Jr., Battles, Bungeroth & McBurney P.A., North Conway, NH.

Jennifer Rood, Backus, Meyer, Solomon & Rood, Manchester, NH.

Charles L. Greenhalgh, Winer & Bennett, Nashua, NH.

Gary A. Braun, Winer & Bennett, Nashua, NH.

Geraldine Karonis, Asst. U.S. Trustee, Manchester, NH.

## MEMORANDUM OPINION

MARK W. VAUGHN, Bankruptcy Judge.

The Court has before it a contested matter in which the debtor-movant, Stafford's in the Fields, Inc. ("Debtor"), objects to a proof of claim, as amended, filed by Respondents, William E. and Carol C. Beggs ("Beggs"). The Beggs' proof of claim incorporates by reference certain allegations included in a

writ of summons filed in the Carroll County Superior Court seeking damages for breach of contract, negligent misrepresentation and intentional misrepresentation in the amount of $234,172.12. The Court, in a procedural order dated April 12, 1995, ordered that Part VII of the Federal Rules of Bankruptcy Procedure apply to this contested matter and that trial would proceed on the issue of liability on the breach of contract claim. By order dated May 3, 1995, the Court indicated that the tort claim be tried on the issue of liability alone. A full-day trial was held on June 8, 1995, and oral arguments were heard on June 22, 1995, at which time the Court took the matter under advisement.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## FACTS

The Debtor is the owner-operator of a country inn located in Chocorua, New Hampshire. Fred and Ramona Stafford are the current owners of all of the outstanding shares of the Debtor and are the current officers and directors. They have operated the inn for over thirty years. Mr. Stafford testified that the Debtor had been in default of its mortgage obligation with Fleet Bank since 1990, and first received a notice of intent to accelerate and foreclose on September 14, 1993. Since that time, they had been trying to sell the inn and also negotiate with Fleet Bank. In January 1994, the Debtor and the Staffords entered into a listing agreement with New England Hotel Realty Advisors to list the inn for sale at the price of $450,000. The principal broker for the transaction was Mr. Earl B. Wason ("Wason"). On June 20, 1994, the Staffords signed a purchase and sale agreement with Mr. Beggs for the sale of the inn at a purchase price of $440,000. Paragraph 1 of that agreement identified the parties to the agreement as follows: Stafford's in the Field, Inc.—Seller;

William Beggs—Buyer; and Fred and Ramona Stafford—Staffords. On the signature lines, Fred and Ramona Stafford each signed as sellers. There was no specific signature line identifying Stafford's in the Field, Inc. Neither of the Staffords indicated any corporate office next to their signatures.

The three paragraphs of the agreement that are relevant to the matter before the Court are hereinafter reproduced:

7. The closing shall take place and the instruments of conveyance shall be delivered at 1:00 p.m. on August 12, 1994, at Carroll County Registry of Deeds, Ossipee, NH or on such later date as the parties may mutually agree; provided, however, that the closing shall not take place between Aug. 13, 1994 and Aug. 24, 1994, inclusive.

. . . .

20. This AGREEMENT is subject to the BUYER obtaining a written S.B.A. 504 mortgage commitment from a lending institution in the amount of $535,000 at the prevailing rate and term. The BUYER hereby agrees to execute promptly the instruments necessary to obtain such written mortgage commitment. A copy of said written mortgage commitment is to be given to the SELLER's agent, NEW ENGLAND HOTEL REALTY or its representative. BUYER hereby grants to the lending institution permission to have a copy of said written mortgage commitment forwarded to NEW ENGLAND HOTEL REALTY. If said written mortgage commitment cannot be obtained after diligent efforts on or before August 1, 1994, all payments hereunder by the BUYER including interest earned thereon shall be forthwith refunded less any legal, appraisal, credit or engineering fees incurred on BUYER's behalf and all other obligations of all parties hereto shall cease and this AGREEMENT shall be void and without recourse to the parties hereto; provided that the BUYER notified the SELLER or the SELLER's agent in writing of their inability to obtain said financing on or before said date.

20a. BUYER shall give the STAFFORDS a mortgage for $85,000 in a subordinated position to the S.B.A. 504 loans and be secured by the real estate and personal property. Said mortgage shall be divided into two notes as follows:

Note 1. $55,000 for a term of twenty years. The interest rate for the first five years of the term shall be fixed at 8.75%. No payments shall be made for the first five years of the term and interest shall be capitalized and added to the principle [sic]. Beginning sixty months following the date of the note, the remaining balance of the principle [sic] and capitalized interest shall be amortized for the remaining fifteen years of the term at a rate of interest equal to the greater of two points over the posted New York prime rate or 8.75% and adjusted annually. The interest rate shall not exceed 12.75% over the life of the loan.

Note 2. $30,000 for a term of twenty years. The interest rate for the first five years of the term shall be fixed 8.75%. Interest only shall be payable monthly for the first five years of the term with payments of $218.75. The principle [sic] balance of $30,000 shall be amortized over the remaining fifteen years of the term at a rate of interest equal to the greater of two points over the posted New York prime rate or 8.75% and adjusted annually. The interest rate shall not exceed 12.75% over the life of the loan.

BUYER shall, at the end of the expiration of sixty months following the date of each of the above described notes, apply to the S.B.A. in writing for consent to pay off the outstanding balance of the notes. In the event of consent to same BUYER shall within ninety days pay off said balance. In the event that the S.B.A. shall fail to consent, BUYER shall every twelve months thereafter resubmit in writing said request. BUYER shall diligently pursue such request on each occasion and shall provide to seller evidence of each such application to the S.B.A.

These two notes are to be secured by a real estate mortgage and security agreement on all business assets, and to be personally guaranteed by William and Carol Beggs. BUYER shall provide STAFFORDS with copies of all requests for disbursement of funds from the construction and remodeling account with the PRIMARY LENDER and evidence of payment.

(Debtor's Exhibit No. 6 at 3 & 4.)

The agreement utilized by the parties was one of the broker's prepared agreements modified to fit the transaction. The testimony was that it was basically prepared by Wason and Attorney Battles, who represented the Debtor and the Staffords in this transaction. Mr. Beggs was not represented by counsel during the formation of the contract.

At the time of entering into the agreement, the foreclosure originally scheduled for July 12, 1994, had been postponed until August 17, 1994, largely due to the existence of the purchase and sale agreement.

On July 31, 1994, Mr. Beggs sent Wason a letter couched in terms of a telephone conversation he had with Wason stating the following:

1. While he had a financing commitment from Farmington National Bank, it was conditional on the approval of the SBA under its 7a program. The letter continued and stated, "[i]t will be necessary for the commitment date to be extended until August 8, 1994 to obtain this approval." (Debtor's Exhibit No. 8.);

2. Paragraph 20 shall be changed to reflect the SBA's 7a program rather than the 504 program and the amount of the commitment would be a $399,500 first mortgage and a $50,000 line of credit; and

3. Paragraph 20a would be modified to increase the mortgage given to the Staffords to $112,000. Note 1 would be increased to $82,000.

As a result of this letter, Attorney Battles testified that it was his opinion that the contract terminated and that the letter constituted a counteroffer. While there is some

confusion in the record as to when and to whom he rendered this opinion, Mr. Stafford testified that after August 1, 1994, he believed that the contract was terminated. Both Mr. Stafford and Attorney Battles testified that neither informed Mr. Beggs of this position since they were still afraid of the Fleet foreclosure and wanted to keep all of their options open. In fact, during this period, certain health, insurance and environmental inspections took place on the premises. On August 5, 1994, Farmington National Bank issued a commitment letter in the amount of $349,000 and a $25,000 line of credit. This was apparently received by Attorney Battles on August 8, 1994, and forwarded to Fleet's attorney on the same day. On August 9, 1994, Attorney Battles forwarded a package of closing documents to Attorney Jones, who represented the Farmington National Bank.

On August 9, 1994, serious negotiations commenced between the Debtor and Poopsy Investments, Inc., an investment company owned by customers of the Debtor. On August 11, 1994, the Debtor consummated a financing agreement of $150,000 with Poopsy and paid off the Fleet mortgage, thus ending the immediate threat of foreclosure. On August 11, 1994, Wason informed Mr. Beggs that the Debtor had obtained alternative financing and that the deal was off. Mr. Beggs and the bank elected to appear at the previously scheduled closing on August 12, 1994, at which time, Mr. Beggs testified, the deal was proposed to close with the original amount of seller financing. Neither the seller nor any representative of the seller attended the August 12, 1994, meeting. By letter dated August 12, 1994, counsel for Mr. Beggs informed the seller that the closing was rescheduled for August 17, 1994, and also threatened a lawsuit. On August 12, 1994, counsel for the Debtor instructed Wason to return the deposit to Mr. Beggs pursuant to paragraph 20 of the purchase and sale agreement. By letter dated August 17, 1994, counsel for the Debtor informed counsel for Mr. Beggs of the Staffords' position that the seller would not attend the proposed August 17, 1994, closing.

On or about September 6, 1994, Beggs brought suit in the Carroll County Superior Court and obtained an attachment on the Debtor's property. On December 2, 1994, the Debtor filed its petition under Chapter 11 of Title 11 of the United States Code.

### DISCUSSION

The objection to the proof of claim raises several issues which will be treated separately hereunder. They are:

1. The Debtor never formally signed the purchase and sale agreement, and the statute of frauds prevents its enforcement against the Debtor.

2. If there were a valid purchase and sale agreement, it would have terminated on August 1, 1994, when the buyer did not have his financing commitment pursuant to Article 20 of the purchase and sale agreement.

3. The Debtor denies that there was any negligent misrepresentation for which tort liability can be imposed.

4. The Debtor denies that there was any intentional misrepresentation for which tort liability can be imposed.

### BURDEN OF PROOF

Case law is clear that a proof of claim is prima facie evidence of a debt and creates a presumption of validity that must be objected to and rebutted by some showing of evidence. *See, e.g., Burger v. Level End Dairy Investors (In re Burger)*, 125 B.R. 894, 902 (Bankr.D.Del.1991); *In re Beverages Int'l Ltd.*, 50 B.R. 273, 280 (Bankr.D.Mass. 1985). However, once the presumption is overcome, the burden shifts back to the claimant who bears the ultimate burden of persuasion to establish by a preponderance of the evidence that the claim is valid. *Burger*, 125 B.R. at 902. The Court finds that the Debtor has submitted sufficient evidence on all counts to rebut the presumption of validity and that the ultimate burden of persuasion lies with the Beggs.

### Issue 1—Party to the Agreement

The Debtor argues that it never formally signed the purchase and sale agreement and, therefore, it is not a party to the

agreement. The Beggs argue that since each of the Staffords signed above the line designated "Seller," the Debtor is a party to the agreement. Where the identity of the parties to a contract is ambiguous, the Court looks to all of the facts and circumstances surrounding the transaction. It is a matter of fact for the trial court to determine. *De-Fillipo v. Testa*, 117 N.H. 704, 708, 378 A.2d 738 (1977).

In the instant case, Mr. Stafford testified that at the time of the transaction in question, he and his wife were the only officers, except for a corporate secretary, the only directors and the majority shareholders. Mr. Stafford further testified that they ran the day-to-day operations of the debtor. (Transcript at 33.) More importantly, Mr. Stafford testified that, although he did not sign as "President," at the time he signed, he had the intent of conveying the corporate property. (Transcript at 46.) Attorney Battles testified that with respect to this transaction, he represented both the corporation and the individuals. Wason testified it was his understanding that he was acting on behalf of the Debtor.

The Debtor's only argument in support of its position that the corporation is not a party to the purchase and sale agreement is that Mr. Stafford was told to sign the document the way he signed it and that when he usually signs corporate documents, he indicates his title as a corporate officer.

These facts and circumstances indicate that the Staffords intended to bind the corporation when they signed the agreement. Therefore, the Court finds that the Debtor is a party to the purchase and sale agreement.

### Issue 2—Validity of Contract

■ Having found that the Debtor is a party to the purchase and sale agreement, the Court must next decide whether the contract became void as of August 1, 1994, or whether the Debtor breached the contract by not closing.

The Debtor argues that Mr. Beggs did not have the financing commitment discussed in paragraph 20 of the purchase and sale agreement on August 1, 1994, and that the July 31,

1994, letter to Wason constituted the notice of inability to obtain financing required by the last sentence of paragraph 20. Consequently, the Debtor argues that the purchase and sale agreement was void as of August 1, 1994, and thereafter no contract existed between the Debtor and Mr. Beggs.

Mr. Beggs argues that the provision in paragraph 20 was for his benefit, the July 31, 1994, letter waived this protection and the purchase and sale agreement continued after August 1, 1994. Mr. Beggs further argues that on the appointed date of closing, he was ready, willing and able to perform under the original contract and that the Debtor, by not appearing at the closing and conveying the property, breached the contract entitling Mr. Beggs to damages. Mr. Beggs did not seek specific performance, either at the state court level or in this Court.

Paragraph 20 required the buyer to obtain a "written S.B.A. mortgage commitment from a lending institution in the amount of $535,000 at the prevailing rate and term." (Debtor's Exhibit No. 6 at 4.) If the buyer notified the seller of his inability to obtain the commitment on or before August 1, 1994, the contract would be void and the buyer would be entitled to a return of his deposit.

The letter of July 31, 1994, informed the seller that he had conditional commitment subject to SBA approval and that the deadline had to be extended. This commitment was for $399,000 and a $50,000 line of credit under an SBA 7a program and not the 504 program. The letter also indicated that the seller had to increase the seller financing to $112,000 from $85,000 and Note 1 would be increased to $82,000 from $55,000. This was an increase of $27,000.

Thus, the letter requested an extension of the financing commitment deadline, changed the amount of institutional financing and the SBA program and increased the amount of seller financing, placing the increase on the first note under which no payments were made for five years. The Court does not consider the change in the SBA program to be a material change and the testimony of Mr. Stafford that he did not care which program provided financing supports that conclusion. While the letter request did not

modify the purchase price, the Court finds that the requested modification of the amount of institutional financing and seller financing were material terms of the contract.

First, with respect to the institutional financing, Mr. Stafford testified that he relied on the original amount of $535,000 in financing to provide for significant capital improvements to the premises should Mr. Beggs default and the property go to foreclosure. While Mr. Beggs argues that less institutional financing put the Debtor in a better position, Mr. Stafford's testimony is credible that this is what he believed.

Second, the proposed change to the seller financing is a major modification to the Debtor. The Debtor, facing an imminent foreclosure, entered into a purchase and sale agreement marginally acceptable to it. The July 31, 1994, letter had the effect of providing less cash at closing and more debt on a note that was unperforming for five years.

■ Finally and most importantly, the Court finds that the July 31, 1994, letter was a notice from the buyer to the Debtor that it did not have financing and, thus, the contract by its terms became null and void on August 1, 1994. The letter included the language "this commitment is conditional" and "[i]t will be necessary for the commitment date to be extended until August 8, 1994 to obtain this approval." (Debtor's Exhibit No. 8.) Mr. Beggs argues that the letter constituted waiver of the financing condition. "A finding of waiver must be based upon an intention expressed in explicit language to forego a right, or upon conduct under the circumstances justifying an inference of a relinquishment of it." *Renovest v. Hodges Dev. Corp.*, 135 N.H. 72, 79, 600 A.2d 448 (1991) (citations omitted). This request to extend the commitment date is inconsistent with a waiver of the financing contingency. If Mr. Beggs intended to waive the commitment contingency, no letter was necessary. The contract provided for notice only if the contingency had not been met. Mr. Beggs was attempting to protect his $25,000 deposit.

■ Further, the Court finds it appropriate under the circumstances of this case to adopt a rule of strict compliance with the terms of the contract. "If the occurrence of a condition is required by the agreement of the parties, rather than as a matter of law, a rule of strict compliance traditionally applies." 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.3 at 353 (1990). "The reasoning behind this rule is that when the parties expressly condition their performance upon the occurrence or nonoccurrence of an event, rather than simply including the event as one of the general terms of the contract, the parties' bargained-for expectation of strict compliance should be given effect." *Renovest*, 135 N.H. at 78–79, 600 A.2d 448. The July 31, 1994, letter notified the Debtor that the condition had not been met. The contract, by its terms, became void. The contract having become void, the Debtor, faced with an imminent foreclosure, became free to seek alternatives.

Beggs cites *Ross v. Eichman*, 129 N.H. 477, 529 A.2d 941 (1987), for the position that the financing clause is for the benefit of the purchaser and not enforceable against the purchaser by the seller. *Ross* can be distinguished in several ways. First, the court in *Ross* found that the buyer had waived the financing contingency. This Court has found expressly to the contrary. Second, in the instant case, the contract contains the specific language suggested by the New Hampshire Supreme Court to protect the seller. "If the sellers had wanted to protect themselves, they merely had to make this clear by adding a provision to the contract requiring that an institutional lender be committed to the buyers by a date certain." *Id.* at 480, 529 A.2d 941. Finally, Beggs cites *Ross* for the proposition that the purpose of the financing clause is "to protect the buyer from involuntary breach." This is exactly what this Court has found. There was no breach, the contract became void and the buyer was entitled to a return of his deposit.

■ In case there is any question as to whether the July 31, 1994, letter constituted a counteroffer, the Court will deal summarily with that issue. In short, whether it is described as a counteroffer or a modification, the record is clear that the terms were never accepted by the Debtor. That being the

case, no contract existed after August 1, 1994.

### Issue 3—Negligent Misrepresentation

▮ It would appear from the pleadings and the evidence presented by Beggs that the gravamen of this count is that the Debtor either had an obligation to notify Mr. Beggs of its position that the contract was void after August 1, 1994, and/or respond to the proposed changes to the contract. The Court has held the contract void as of August 1, 1994, and that no subsequent contract was entered into by the parties. The New Hampshire Supreme Court has spoken clearly in *Daley v. Blood,* 121 N.H. 256, 428 A.2d 900 (1981), that the statute of fraud bars an action in negligence arising out of a matter that would otherwise be barred by the statute of frauds. "Certainly, to bar recovery in contract but to allow it generally in negligence would subvert the policy of the Statute of Frauds and open the door to the evils the statute is designed to avoid. If we were to allow this negligence action to be maintained in the face of the Statute of Frauds, the practical effect would be to render that statute almost meaningless." *Daley,* 121 N.H. at 257–58, 428 A.2d 900 (citation omitted).

Because the original contract terminated by its terms on August 1, 1994, any new agreement for the purchase and sale of the real property would be required to be in writing by the statute of frauds. No such writing exists. This is exactly the situation anticipated by *Daley.* The count of negligent misrepresentation cannot stand.

### Issue 4—Intentional Misrepresentation

▮ The one remaining issue for the Court to decide is the Beggs' allegation of intentional misrepresentation. Unlike negligent misrepresentation, the New Hampshire Supreme Court has held for policy reasons that intentional misrepresentation is not barred by the statute of frauds. *Munson v. Raudonis,* 118 N.H. 474, 478, 387 A.2d 1174 (1978).

▮ "In order to prevail in a deceit action, the plaintiff must prove that there was a misrepresentation of fact.... If the speaker makes a promise and at the same time intends not to perform, this operates as a misrepresentation of the speaker's state of mind and a proper basis for an action in deceit." *Id.* at 477, 387 A.2d 1174. "Intentional misrepresentation or fraud must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation." *University System of New Hampshire v. United States Gypsum Co.,* 756 F.Supp. 640, 650 (D.N.H. 1991).

In deciding this issue, the Court is somewhat hampered because neither Count C of the state court writ incorporated by reference, nor the Beggs' memorandum of law states with specificity the misrepresentations or representations upon which Mr. Beggs relies. While not pled with specificity, it appears from the evidence at trial that Beggs' theory is that the Debtor had a duty to respond to his July 31, 1994, letter and its failure to respond is the misrepresentation relied on by him. This Court disagrees.

In the case of *University System of New Hampshire v. United States Gypsum,* that court stated, "[t]he court agrees with defendants that absent evidence of a communicated representation there can be no misrepresentation." *University System of New Hampshire,* 756 F.Supp. at 651. That quote went on to say that "[i]ntentional concealment of a material fact may constitute fraud. For a failure to disclose to rise to the level of actionable fraud, however, there must be a duty to disclose." *Id.* at 651 (citations omitted). That was a case of a concealed defect. This case is not.

The evidence is clear. Mr. Beggs sent the July 31, 1994, letter which not only requested an extension of the date of the financing contingency, but also requested material changes to the purchase and sale agreement. The Debtor did not respond. In fact, there was no specific communication from the Debtor to Mr. Beggs with respect to that letter until after the Debtor had obtained alternative financing. The Debtor did allow certain inspections to take place on the premises, and the Debtor's counsel did prepare

certain closing documents which were forwarded to the bank's counsel. Mr. Stafford testified that while he believed that the contract was no longer binding after the July 31, 1994, letter, he proceeded to attempt to keep his options open since the foreclosure was still imminent. Further, upon obtaining alternative financing, the Debtor immediately informed Mr. Beggs of its position that the deal was off.

The evidence is also clear that once Mr. Beggs sent the July 31, 1994, letter, even though he was dealing with material modifications to a contract for the purchase and sale of real property, he took no action to follow up and make sure that the terms of his letter had been affirmatively agreed to by the Debtor. By sending the letter, Mr. Beggs, like the Staffords, was keeping his options open. Most importantly, Mr. Beggs never informed the Debtor that he would be able to close with the original seller financing terms intact until after he was notified that the deal was off. By that time, it was too late.

Based on all of the above, the Court finds that the Debtor made no specific representation to Mr. Beggs knowing at the time that the representation was false or with conscious indifference to its truth. The Court further finds that the Debtor had no duty to respond and, having no duty to respond, that its failure to do so was not intentional misrepresentation. While not necessary to this decision, the Court would further find that Mr. Beggs' failure to follow up on his letter of July 31, 1994, would abrogate any claim of justified reliance on the Debtor's inaction.

### CONCLUSION

For the reasons cited herein, the Debtor's objection to Beggs' proof of claim is sustained, the proof of claim is disallowed in full and the attachment securing said claim against the Debtor recorded in the Carroll County Registry of Deeds on September 7, 1994, is declared null and void.

This opinion constitutes the Court's findings of facts and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.