Grafton
No. 79-162

93 CLEARING HOUSE, INC.

v.

AMIN KHOURY & a.

May 12, 1980

*Sanders & McDermott,* of Hampton (*Wilfred L. Sanders, Jr.,* orally), for the plaintiff.

*Hall, Morse, Gallagher & Anderson,* of Concord (*Charles T. Gallagher* orally), for the defendant.

PER CURIAM. This case presents four issues. First, whether 93 Clearing House, Inc. (hereinafter 93) is entitled to a commission for services rendered in the sale of the defendant Amin Khoury's house. Second, whether a new trial should be granted to reconsider evidence relevant to the determination of damages stemming from alleged cost overruns on a construction project. Third, whether the master erred in admitting allegedly prejudicial and irrelevant testimony at trial to support the finding of a binding contract between the parties regarding the sale of condominiums. Fourth, whether the master correctly interpreted the language of a remedies clause contained in a lease agreement. The first issue involves 93 and the defendant Amin Khoury as an individual. The other three issues pit 93 against Amin Khoury and others doing business as Campton Realty Associates (hereinafter Campton).

The case was heard before a Master (*Walter D. Hinkley*, Esq.) who found for the plaintiff and denied the defendants' request for a new trial. *Johnson*, J., entered a decree approving the master's recommendations and reserved and transferred the defendants' exceptions.

With regard to the first issue, Amin Khoury argues that the master erred in awarding a commission to 93 for services rendered in procuring the sale of his house. We remand for further findings.

The master found that 93 was engaged in business as a developer and builder, and in those capacities was interested in selling lots and in building homes. 93 also on occasion acted as a real estate agent. It had built Amin Khoury's residence. After the Khoury house had been completed, a man named Indursky talked to Thomas Mullen, a 93 representative, about buying a lot and building a home. He asked Mr. Mullen to show him homes that 93 had already built so he could have some idea of the company's workmanship. Mr. Mullen asked Mr. Khoury if he could show his house to Mr. Indursky as an example of 93's work, and Mr. Khoury agreed. When Mr. Indursky saw the Khoury house he inquired whether it was for sale. 93 checked with Mr. Khoury and was advised that the house might be for sale. Thereafter, negotiations were conducted, largely between Messrs. Indursky and Khoury, that resulted in Mr. Indursky purchasing the Khoury house for $202,000.

The master found that 93 was not entitled to the standard broker's commission because it did not act as a broker within the usually accepted meaning of the term. The master distinguished 93's role in the sale of the Khoury house from that of a broker based on the following specific findings: The impetus for the sale came from the buyer rather than the seller, no set fee was ever stated by 93 or agreed to by Mr. Khoury prior to the sale of the house, 93 did not attend the closing or claim any broker's fee at the time of closing, and negotiations were mainly conducted directly between the buyer and the seller. In the master's view, 93's claimed 6% commission (6% × $202,000 = $12,120) was "more than 93's services were worth." He therefore recommended an award of $3,500. This result does not conform to the law.

■ ■ The first inquiry in any real estate commission case is whether the seller and the broker had an agency agreement. If there was none, the broker cannot recover. *Richardson v. Sibley*, 101 N.H. 377, 143 A.2d 414 (1958). An agency relationship exists

only when the seller gives the agent some manifestation that the agent may act on his behalf and the agent consents to do so. *Id.* The manifestation and consent need not be written; in fact, it may be implied from the parties' conduct or other evidence of intent. 3 AM. JUR. 2d *Agency* § 17 (1962); *see Richardson v. Sibley supra.* In the present case, there was conflicting evidence relating to the existence of an agency relationship and the master could reasonably have found for either party. We remand for such a finding.

 If the master finds agency on remand, the question of the amount of the commission will arise. A broker has a right to his commission if he procures a willing and able buyer. *Richardson v. Sibley supra.* A broker procures a customer if he informs him of the property and leads him to the seller. *Kopka Real Estate Inc. v. MacLeod,* 119 N.H. 547, 404 A.2d 298 (1979). It seems clear in this case that 93 "procured" Mr. Indursky. It makes no difference that the buyer initiated the sale. Nor is it dispositive that 93 did not attend the closing and that Messrs. Khoury and Indursky negotiated the sale without assistance from 93. *DiMarzio v. Read,* 118 N.H. 925, 395 A.2d 1253 (1978). When as in this case, the amount of the commission was not agreed upon, the agent is entitled to the reasonable worth of his services. 3 AM. JUR. 2d *Agency* § 248 (1962); *see Stanton v. Embrey,* 93 U.S. 548 (1876). In our view, this should be determined in the light of what others were paid at the time and in that area for similar services. 3 AM. JUR. 2d *Agency* § 248 (1962). There was evidence in this case that the standard fee in the area was 6% of the selling price. We remand to the master for a finding regarding the existence of an agency relationship, and, in the event that he finds one, for a redetermination of the agent's compensation.

The remaining issues arise from transactions between 93 and Campton Realty Associates. The first of these stems from a contract by which 93 agreed to build a store and an office building for Campton. The fixed price was $350,000. At trial, Campton alleged that 93's cost overruns caused it to spend considerably more than $350,000 for the completed project. In attempting to prove the overruns, Campton offered a series of five exhibits consisting of checks, invoices and a ledger sheet, all purporting to represent money that Campton paid to 93, its subcontractors and materialmen. These exhibits totaled $416,115.86. The master's narrative findings of fact, printed in the reserved case, indicate

that he added together only two of the five exhibits in his derivation of Campton's project-related expenses. Finding this total to be less than $350,000, he did not award Campton damages. Campton now contends that the master erred in considering only two of its five offerings and in denying its motion for a new trial. We disagree.

In reviewing damage awards, this court views the evidence in the light most favorable to the prevailing party. *Dana A. Wein & Sons v. Keller*, 118 N.H. 545, 391 A.2d 878 (1978). Further, the factfinder is not bound to believe even uncontroverted evidence. *Cragin v. Woollett*, 104 N.H. 202, 182 A.2d 457 (1962); *see State v. Rullo*, 120 N.H. 149, 412 A.2d 1009 (1980). In this case the master added together two packets of checks, exhibits (L) and (M), entered into evidence through the defendant's witness, Richard Khoury. The master did not add in a ledger sheet, also put into evidence through Richard Khoury, and two other checks put in through the plaintiff's witness, William Cargill. The exhibits differed in kind and were offered through different witnesses. Apparently the master determined that one kind of evidence (checks), entered through one witness (Richard Khoury), was credible on the issue of cost overruns and that the rest of the evidence was not. Weighing the evidence is a proper function of the factfinder and generally we will not review it. *Hill v. Carr*, 78 N.H. 458, 101 A. 525 (1917). The trier of fact is in the best position to measure the persuasiveness of evidence and the credibility of witnesses. *Kierstead v. Betley Chevrolet-Buick Inc.*, 118 N.H. 493, 497, 389 A.2d 429, 432 (1978). In this case, we defer to the master's judgment. *Id.*

Campton next argues that the master erred in admitting certain testimony on the issue whether a contract existed whereby Campton agreed to assume 93's debts as part of the purchase price for the sale of condominiums. Testimony related to Campton's payments to certain of 93's lien creditors. Campton contends that the testimony was both irrelevant and prejudicial. We disagree.

There was evidence at trial of both a draft agreement and a letter signed by Campton's counsel setting forth the terms of the agreement. Testimony of Campton's conduct in paying certain of 93's creditors was admissible to indicate Campton's understanding of the agreement and its intention to be bound by its terms. *Griswold v. Heat Corp.*, 108 N.H. 119, 229 A.2d 183 (1967). This

was sufficient to support a finding of a contract between the parties.

■ Finally, Campton asserts that the master incorrectly interpreted a lease agreement between the parties. In 1974, 93 leased certain restaurant premises from Campton. By its terms, the lease was to terminate on March 31, 1979. On June 14, 1977, after 93 had failed to pay rent for two months, Campton locked the restaurant and delivered the keys to the sheriff. Richard Khoury testified that shortly thereafter he changed the locks and put certain equipment and foodstuffs in storage. The "remedies" section of the lease reads in part as follows:

12.2 *Remedies.* . . . Lessor may at any time [after default] . . .

(a) *Terminate Lessee's right to possession of the Premises* by any lawful means . . . in such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including, but not limited to, the cost of recovering possession . . . expenses of reletting . . . reasonable attorney's fees . . . the worth at the time of award by the court . . . *of the amount by which the unpaid rent for the balance of the term after the time of such award exceeds the amount of such rental loss* for the same period that Lessee proves could be reasonably avoided. . . .

(b) Maintain Lessee's right to possession. . . . In such event Lessor shall be entitled . . . to recover the rent as it comes due hereunder.

(Emphasis added.) Based on a finding that the change of locks and the removal of 93's property constituted a denial of 93's right to possession the master found that section 12.2(a) applied. He also found that the lessee offered no evidence on the question whether some part of the rental loss could be avoided. The master therefore awarded Campton the unpaid rent for the two months preceding Campton's retaking as well as unpaid rents for the period dating from the time of the court's projected award to the end of the lease. He declined to award any unpaid rents for the period between the retaking and the date of the award. Campton now argues that this determination was the result of an erroneous interpretation of the lease. We disagree.

To require 93 to pay rent for a period during which it was precluded from occupying the premises would be unduly harsh. This is especially so in light of section 12.2(b), which allows recovery of unpaid rents after breach if the lessor maintains the lessee's right to possession. The language of sections 12.2(a) and .2(b), read *together*, convinces us that Campton's maintenance of 93's right to possession was a precondition to recovery of rents for the period between the breach and the subsequent award. *See Bellak v. Franconia College*, 118 N.H. 313, 386 A.2d 1266 (1978).

*Remanded.*