**In re CLARKEIES MARKET, L.L.C., Debtor.**

**Clarkeies Market, L.L.C., Plaintiff,**

v.

**Associated Grocers of New England, Inc., Defendant.**

**Bankruptcy No. 01–10700–JMD.**
**Adversary No. 01–1177–MWV.**

United States Bankruptcy Court, D. New Hampshire.

Jan. 21, 2005.

M. Elaine Beauchesne, Pierce Atwood, Portsmouth, NH, for Plaintiff.

Thomas J. Pappas, Wiggin & Nourie, Manchester, NH, for Defendant.

### *MEMORANDUM OPINION*

MARK W. VAUGHN, Chief Judge.

The Court has before it the complaint of Clarkeies Market, L.L.C. ("Clarkeies") against Associated Grocers of New England, Inc. ("AGNE") consisting of nine counts as follows:

Count I Breach of Fiduciary Duty

Count II Breach of Confidential Relationship

Count III Violation of RSA 358–A

Count IV Breach of Covenant of Good Faith and Fair Dealing

Count V Negligent Provision of Brokerage Services

Count VI Negligent Misrepresentation

Count VII Negligent Provision of Due Diligence

Count VIII Equitable Subordination

Count IX Determine Validity, Extent, and Priority of AGNE's Liens

The Court tried this case for a period of ten days over the course of a two-month period. In preparing this opinion, the Court has reviewed the transcripts of the first six days of trial, its notes and, when necessary, listened to the trial tapes. The Court also reviewed voluminous documentary evidence submitted by both Clarkeies and AGNE.

## JURISDICTION

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## FACTS

The dispute arises out of the purchase of two grocery stores by Clarkeies on November 30, 1998. One store was located in Berlin, New Hampshire, owned by K & R Supermarkets, Inc., d/b/a Kelley's Food Town. The second store was located in Woodsville, New Hampshire, and owned by Kelley's Food Town, Inc., d/b/a Kelley's Food Town. The latter corporation also owned a store in Franconia, New Hampshire. Karl C. Kelley was the principal in both entities.

In order to understand the legal theories put forth by Clarkeies and the defenses thereto, it is necessary to go back in time prior to November 30, 1998.

AGNE is a New Hampshire corporation and operates as a member cooperative whose members are independent retail grocers. AGNE sells food and other grocery store products to its members and to non-members and offers certain services to assist them in the operation of their grocery stores, including financial services and retail counseling.

Alan S. Clarke and Susan A. Clarke are the only members of Clarkeies. Alan S. Clarke is the managing member. Mr. Clarke has worked in the grocery store industry for over thirty years, including Grand Union, Shaw's Supermarkets, Alexander's and Prescott Farms. In 1991, Alan Clarke and two others formed ACH Supermarket and purchased what was then a Prescott Farms store located in Raymond, New Hampshire. This store was called Freshway Foods. C & S Wholesalers was the primary supplier to Freshway and is similar to AGNE. At the time of the purchase, the Freshway store had been closed. ACH received financing from Cornerstone Bank. Hannaford Brothers had a store in the area which competed with ACH. ACH failed.

Alan Clarke became director of operations for Prescott Farms and supervised their stores located in Berlin, Colebrook and Groveton, New Hampshire. Prescott Farms was supplied by AGNE and utilized AGNE's retail accounting program and retail counseling.

Clarkeies Market, L.L.C., was formed in March 1997. It bought the Prescott Farms stores in Groveton and Colebrook, New Hampshire. Clarkeies was represented by counsel and utilized an accountant in that transaction. Mr. Ennis of AGNE assisted Clarkeies in reformatting financial statements and met with several financing sources with Mr. Clarke. However, financing for the transaction was obtained through Berlin City Bank in the form of an SBA loan. Mr. Ennis did not meet with Berlin City Bank.

AGNE supplied the Groveton and Colebrook stores and provided $200,000 in financing to purchase inventory. Clarkeies became a member of AGNE and utilized AGNE's retail accounting services, as required by the terms of the financing.

In June 1998, Mr. Karl Kelley informed Mr. Bancroft (then AGNE's head of sales) that the Berlin and Woodsville stores were for sale. The Franconia store was reserved for Mr. Alan Hall, Kelley's general manager. AGNE was interested in facilitating a sale of the three stores, which were then supplied by Hannaford Brothers, in order to obtain the supply business for AGNE. At some point, AGNE, through Mr. Bancroft and Mr. Turcotte (AGNE's CEO), was told that Mr. Kelley wanted $1.5 million for the three stores, which included all assets, including inventory. They were also informed early on that Mr. Hall desired to purchase the Franconia store. Using figures provided by Mr. Kelley, Mr. Bancroft and Mr. Turcotte prepared income and cash flow statements in an effort to make an offer to Mr. Kelley and determine an allocation on the sales price between the three stores. Projections were based on seller financing by Mr. Kelley.

Messrs. Bancroft and Turcotte also prepared a list of persons who might be interested in buying the Woodsville and Berlin stores. This list included Alan Clarke of Clarkeies who, pursuant to a call from AGNE, said he was interested in purchasing additional stores.

On July 27, 1998, Mr. Turcotte and Mr. Bancroft met with Mr. Clarke at the Double S Restaurant in Lancaster, New Hampshire. The purpose of this meeting was to discuss Mr. Clarke's interest in purchasing the stores. While there is contradiction in the testimony as to just what was said at that meeting, it is apparent that the following subjects were discussed:

1. that both stores were profitable;

2. that Shaw's was going to open a supermarket in Gorham, next to Berlin;

3. that the Berlin store needed a deli department;

4. that Clarkeies had little or no money to invest in the purchase; and

5. that there would be seller financing.

As a result of that meeting, Mr. Clarke expressed his intent to go forward with the purchase.

Subsequent to that meeting, AGNE continued negotiations with Mr. Kelley. AGNE was informed that Mr. Kelley wanted AGNE to provide a guaranty of any seller financing as well as a guaranty of any lease obligations. A total inventory value of $500,000 was assumed for the purpose of the negotiations.

On August 17, 1998, Mr. Clarke met with Mr. Bancroft and Mr. Turcotte at the latter's condominium in Bretton Woods, New Hampshire. Once again, there is some disagreement as to exactly what was said at that meeting, but no one disputes that certain issues, including the Berlin store and its need for a deli, were discussed. The probable purchase price would be fully financed at a low interest rate. Mr. Clarke was shown, but not given, a pro forma income statement and cash flow for the Woodsville store (Pl.'s Ex. 19) and a pro forma income statement and cash flow for the Berlin store (Pl.'s Ex. 20). he was not shown an earlier-prepared income statement and cash flow for the Berlin store that assumed a $500,000 decline in sales.

In early September 1998, AGNE reached an agreement with Mr. Kelley for an aggregate purchase price for the three stores of $900,000 allocated as follows: Franconia $342,000, Woodsville $373,000, and Berlin $185,000. The allocation was done by AGNE. As part of the negotiations, there were further allocations within this purchase price for each store, i.e., machinery and equipment, goodwill and non-compete.

On October 1, 1998, Mr. Clarke met with Mike Violette, who had assumed Mr. Bancroft's position at AGNE, and Bob Bennett of AGNE. As a result of that meeting, AGNE was able to obtain for Mr. Clarke a list of equipment for the two stores, employee information, and weekly sales figures for the last two years for each store. Also discussed were the terms of AGNE's inventory financing and the fact that AGNE's subsidiary, Associated Lease Corp., would be the prime tenant for each store, subleasing to Clarkeies and charging Clarkeies a five percent administrative fee.

Although exactly what took place at each meeting is in dispute, Mr. Clarke did meet with Mr. Hall and the managers and employees of the Woodsville and Berlin stores prior to the closing.

The two closings took place separately on November 30, 1998, i.e., one for Hall and one for Clarkeies. At its closing, Clarkeies entered into agreements with both Kelley and AGNE, including seller financing, AGNE inventory financing, and personal guaranties of the Clarkes. These were the first and only documents executed by Clarkeies or the Clarkes up to this time. All parties were represented by counsel at the closing.

The final purchase price of the Berlin store was $323,080.74. Mr. Kelley provided financing to Clarkeies in the amount of $155,000 at 7.5%, and AGNE provided inventory financing of $138,080.74.

The final purchase price for the Woodsville store was $533,718.97. Mr. Kelley provided financing to Clarkeies of $373,000 at 7.5%, and AGNE provided inventory financing of $160,718.97. Both purchases were 100% financed. AGNE guaranteed the obligations of Clarkeies to Kelley.

Subsequent to the closings, allegedly beginning in December 1998, sales at both stores began to decline. On November 19, 1999, AGNE loaned Clarkeies an additional $100,000. On April 25, 2000, AGNE loaned Clarkeies an additional $22,000.

In February 2001, an offer to purchase the Colebrook and Groveton stores was apparently received by Clarkeies and forwarded to AGNE via a letter from Clarkeies' counsel. The offer was from an entity controlled by Alan Clarke's brother. Shortly thereafter, AGNE instituted litigation in the Hillsborough County Superior Court seeking possession of all stores and enjoining the transfer of the Colebrook and Groveton stores. On March 13, 2001, Clarkeies filed a petition under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of New Hampshire.

### DISCUSSION

■ The Court will first discuss whether there was a principal agency relationship between Clarkeies as principal and AGNE as agent. Both parties cite the case of *Singh v. Therrien Mgt. Corp.*, 140 N.H. 355, 666 A.2d 1341 (1995) to determine how New Hampshire courts have defined this relationship.

■ "Agency" is defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." RESTATEMENT (SECOND) OF AGENCY § 1 (1957). Where no control is given, the relationship of principal and agent cannot exist. *F.C. Adams, Inc. v. Elmer F. Thayer Estate*, 85 N.H. 177, 183, 155 A. 687 (1931). The Restatement goes on to say, "(2) The one for which action is to be taken is the principal. (3) The one who is to act is the agent." RESTATEMENT (SECOND) OF AGENCY § 1 (1957). In the instant case, Clarkeies argues that it manifested its consent for AGNE to act for it when, upon learning from AGNE that the Woodsville and Berlin stores were for sale, it indicated that it was interested in pur-

chasing the stores. In support of this position, it cites *93 Clearing House, Inc. v. Khoury,* 120 N.H. 346, 415 A.2d 671 (1980). In that case, the plaintiff, 93 Clearing House, Inc., introduced the defendant to a Mr. Indursky for the purpose of showing an example of its workmanship in the construction of homes. Upon seeing the Khoury home, Indursky inquired if it was for sale, and when told it might be, he negotiated with and bought the house from Khoury. Under these facts, 93 Clearing House, Inc. sought a commission. The court, while stating that a manifestation of consent may be implied by the parties' conduct or the evidence of consent, made no such finding but remanded it to the trial court for the purpose of determining whether an agency relationship existed, saying that, "the master could reasonably have found for either party." *Id.* at 349, 415 A.2d 671. There is nothing in the record before this Court evidencing a written agency or brokerage agreement between Clarkeies and AGNE because there wasn't one. Consent then must be inferred from other facts and circumstances surrounding the purchase of the two stores. It is AGNE's position that in its negotiations with Kelley, it was putting a package together that could be accepted by a third party buyer, including Clarkeies, or exercised by it on its own behalf since it does operate other grocery stores.

Whether Clarkeies has exhibited the requisite consent that AGNE act on its behalf is suspect. While Mr. Clarke testified is that he believed AGNE was negotiating on his behalf, he also testified that he did not believe he had committed to anything prior to executing the documents on November 30, 1998. (Tr. Day 6 at 76, 80.) This position is inconsistent with the position that he had consented to AGNE acting as his agent.

Another requirement for an agency relationship to exist is that the principal, Clarkeies, exercise control over the agent, AGNE. The evidence does not support the fact that Clarkeies controlled AGNE in AGNE's negotiations with Kelley. AGNE advised Clarkeies of the opportunity. AGNE negotiated a deal with Kelley that AGNE thought was fair. AGNE was looking to supply, not only the two stores that Clarkeies bought, but also the Franconia store purchased by Hall. AGNE negotiated certain leases. AGNE told Clarkeies it would be the primary tenant, and Clarkeies would be its subtenant. AGNE clearly controlled the terms of its inventory financing. For all of the above reasons, the Court finds that AGNE was not acting as Clarkeies' agent in connection with the purchase and sale of the Berlin and Woodsville stores.

■ "A broker is a particular type of agent." *Petition of Contoocook Valley Paper Co.,* 129 N.H. 528, 532, 529 A.2d 1388 (1987). Having found no agency relationship existed, this Court finds that AGNE was not acting as a broker for Clarkeies.

■■ Clarkeies' next position is that, even if AGNE was not an agent or broker, it became a fiduciary for Clarkeies and, as such, had special duties towards Clarkeies which AGNE breached. Citing different cases, both parties basically agree on the definition of a fiduciary under New Hampshire law. "The term 'fiduciary or confidential relation' is a comprehensive one and exists wherever influence has been acquired and abused or confidence has been reposed and betrayed." *Cornwell v. Cornwell,* 116 N.H. 205, 209, 356 A.2d 683 (1976), cited in *Lash v. Cheshire County Sav. Bank,* 124 N.H. 435, 438, 474 A.2d 980 (1984), which was in turn cited in *Brzica v. Trustees of Dartmouth College,* 147 N.H. 443, 447–48, 791 A.2d 990 (2002). In *Lash,* the court went on to say:

A fiduciary relation does not depend on some technical relation created by or defined in law. It may exist under a variety of circumstances and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.

*Lash*, 124 N.H. at 439, 474 A.2d 980 (citations omitted).

In support of its position that AGNE is a fiduciary, Clarkeies looks to the following factors. AGNE is a cooperative of which Clarkeies is a member holding both Class A and Class B stock. AGNE's annual report for 1999–2000 tells about working in a "virtual partnership" and working as a team to gain mutual success. (Pl.'s Ex. 1.) AGNE assisted in the preparation of certain financial reports and visited certain lenders in connection with the Colebrook and Groveton store purchases in 1997. In connection with these purchases, AGNE became Clarkeies' inventory lender and supplier, and Clarkeies utilized AGNE's financial reporting assistance and retail counseling. In connection with the purchase of the Berlin and Woodsville stores, AGNE negotiated the terms of the sale with Kelley and, once again, became Clarkeies' inventory lender and supplier and became Clarkeies' landlord through its subsidiary, Associated Lease Corp.

Clearly, there was a business relationship between Clarkeies and AGNE, but as a result of this relationship, did AGNE acquire influence which it abused or did Clarkeies repose confidence in AGNE which AGNE betrayed? This Court doesn't believe so. First, the Court finds that the statements attributed to the annual report of AGNE do not create a fiduciary relationship. *See Ahrendt v. Granite Bank*, 144 N.H. 308, 312, 740 A.2d 1058 (1999) (a hortatory statement in an employee handbook does not lead to the creation of a fiduciary duty). While AGNE assisted Clarkeies in the preparation of certain financial information in connection with the Groveton and Colebrook transactions, Clarkeies obtained the financing of this purchase on its own from the Berlin City Bank. Further, the testimony of Ennis was that the assistance rendered in this regard was more form than substance. While the parties differ over the nature of the financial services, i.e., Clarkeies asserts they were accounting services, which AGNE characterizes only as bookkeeping services, it is clear that the accountant/client relationship by itself is insufficient to create a fiduciary relationship. *Baldwin v. Kulch Assocs., Inc.*, 39 F.Supp.2d 111, 120 (D.N.H.1998). Further, the testimony of Sherrie Thomas, who worked as a bookkeeper for AGNE, was that when she made comments on a gross profits reports for November 1997, she was told by Mr. Clarke that he didn't want comments or advice. (Def.'s Ex. 117.) Further evidence of the lack of confidence necessary to create a fiduciary relationship includes the fact that Mr. Clarke visited the Berlin and Woodsville stores prior to the closing, spoke to their managers, asked for and received the weekly sales reports for the two stores in late October 1998, and was represented by counsel prior to and at the closing. For all of the above reasons, the Court denies Counts I and II.

■ For purposes of judicial economy, the Court further finds that had a fiduciary relationship existed, there is insufficient evidence of a breach of duty as a result of the fiduciary relationship. The Court agrees with AGNE that there is insufficient evidence of any standard of care in the industry presented by Clarkeies. Clarkeies seems to rely on its designation

of AGNE as an accountant with more than a purely accountant/client relationship, more like an investment advisor. First, the Court does not agree that saying it is so makes it so. What AGNE did in the transaction appears to be commonplace in the industry, supported by the fact that AGNE had completed similar transactions numerous times, such as the ACH transaction introduced by C & S, and the testimony of Mike Violette that similar transactions took place when he was employed by Wetterau.

As an additional duty of care, Clarkeies referred to section 552 of the RESTATEMENT OF TORTS (SECOND) (1977) that provides for liability for one who has a heightened duty of care to provide false information on which one may justifiably rely. Items designated as false information must be the income cash flow pro formas prepared by AGNE, especially for the Berlin store, as shown to Mr. Clarke at the Bretton Woods meeting, and the failure to show him a pro forma of the Berlin store with the $500,000 reduction in sales. The Court finds it hard to categorize pro formas as false information under any circumstance. They are just projections based on assumptions of what might happen in the future. The circumstances surrounding the Berlin store were known to all of the parties, including the alleged lack of competition in 1997, the imminent opening of a Shaw's, and the economic realities of the City of Berlin, New Hampshire. Prior to starting Clarkeies, Mr. Clarke had been responsible for a Prescott Farms store in Berlin and had to be familiar with the territory in general.

Clarkeies asserts that AGNE had a duty of loyalty, which it breached by acting in its own self-interest by becoming the supplier of the three stores, knowing that the Franconia store purchased by Hall acquired the Kelley trade name, allocating too much of the sales price to non-compete and goodwill, and alleging that Hall would have paid more for the Franconia store. This Court disagrees. It is clear that Clarkeies had to know that AGNE would be its supplier and inventory financier and, as such, had to consent to such a relationship. It also knew that AGNE would supply and finance the Franconia store as it did for other stores throughout New Hampshire.

While AGNE did prepare the purchase agreement for Hall which, among other things, included the transfer to Hall of the Kelley trade name, this by itself does not evidence competition and, in fact, there is insufficient evidence in the record that the Franconia store competed with any of the Clarkeies stores. Further, Clarkeies received just the kind of protection required in a non-compete clause from Kelley.

While Clarkeies alleges that a better allocation of the sales price between machinery and equipment, goodwill and non-compete could have been obtained, there is no evidence in the record that Kelley would have agreed to a different allocation. Likewise, although Clarkeies alleges that Hall would have paid more for the Franconia store, there is no evidence in the record that the sales price to Clarkeies for either store was unfair.

■ Clarkeies' third count is seeking damages for AGNE's violation of the provisions of N.H. RSA 358–A. RSA 358–A is entitled, "Regulation of Business Practices for Consumer Protection" (hereinafter "Consumer Protection Act" or "Act"). RSA 358–A:2, entitled "Acts Unlawful," states "it shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to

the following ..." N.H. REV. STAT. ANN. § 358–A:2 (1995 & Supp.2004). The statute then lists fourteen types of acts or practices which are included under the Act. There is no question that AGNE is a "person" as defined in the Act and that it engaged in trade or commerce in the State of New Hampshire. However, the primary business of AGNE is to supply members with products to be used in the retail grocery business and not the facilitating of the purchase of stores. Likewise, Clarkeies is not a "consumer" as the term is usually used. The Court does not believe the actions alleged by Clarkeies are covered by RSA 358–A. The New Hampshire Supreme Court, in *Roberts v. General Motors Corp.*, 138 N.H. 532, 538, 643 A.2d 956 (1994), stated:

> The Consumer Protection Act is a comprehensive statute whose language indicates that it should be given broad sweep. [*Gilmore v. Bradgate Assoc., Inc.*, 135 N.H. 234, 238, 604 A.2d 555 (1992)]. Despite its broad language, however, it is not unlimited in scope. RSA 358–A:2 (1984 and Supp.1993) lists thirteen representative categories of unlawful acts or practices, each dealing with transactions for the provision of goods or services to consumers.... While the Act itself states that it is not limited only to those specific transactions, *see* RSA 358–A:2, we agree with the Massachusetts appeal court that "[r]ules of statutory construction leave us to conclude that the phrase 'including but not limited to,' which precedes this specification, limits the applicability of [the Consumer Protection Act] to those *types* of [acts] therein particularized."

*Id.* at 538, 643 A.2d 956 (emphasis in original). The types of actions as contemplated by the statute relate to goods and services, the sale thereof, the quality thereof, the advertising thereof or the false disparagement of another party's goods and ser-

vices. In contrast, the transaction at issue in this case was a business transaction between two entities engaged in the grocery business, Clarkeies as a retailer, and AGNE as a supplier. It is not a transaction specifically enumerated under 358–A:2. In the case of *State v. Moran*, decided in December 2004, the New Hampshire Supreme Court indicated it clarified its ruling in the *Roberts* case:

> We have recognized that the general provision of the [Consumer Protection Act] is broadly worded, and not all conduct in the course of trade or commerce falls within its scope. *Barrows v. Boles*, 141 N.H. 382, 390, 687 A.2d 979 (1996). Because of the difficulty often associated with determining which commercial actions, not specifically delineated, are covered by the act, we employed the rascality test in *Barrows*. *See Milford Lumber Co. v. RCB Realty*, 147 N.H. 15, 17, 780 A.2d 1259 (2001). In doing so, we clarified our ruling in *Roberts v. General Motors Corp.*, 138 N.H. 532, 538–39, 643 A.2d 956 (1994), in which we had held that in order for conduct *not particularized* by the enumerated categories in the [Consumer Protection Act] to qualify as an unfair or deceptive trade practice, that conduct must be of the same type as proscribed by the enumerated categories. *See Barrows*, 141 N.H. at 390, 687 A.2d 979.
>
> Under the rascality test, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Milford Lumber Co.*, 147 N.H. at 17, 780 A.2d 1259 (quotations omitted).

*State v. Moran*, 861 A.2d 763, 765 (2004) (emphasis in original). Incorporating all of the findings made with respect to Counts I and II above, the Court finds that the actions of AGNE do not satisfy

the requirements of the rascality test; they do not "raise an eyebrow of someone inured to the rough and tumble of the world of commerce." The transaction in question was one in which Clarkeies, AGNE and the sellers were all represented by independent counsel at the November 28, 1998, closing. The Court believes that this kind of business transaction, documented by closing binders including approximately thirty different documents, does not require the type of protection contemplated by the Act. Even if one might consider it to be within "the rough edges of commercial lending," that is not sufficient to trigger a violation of 358–A. *See Barrows v. Boles,* 141 N.H. 382, 390, 687 A.2d 979 (1996). Count III is denied.

■ Count IV alleges a breach of the covenant of good faith and fair dealing inherent in a fiduciary or confidential relationship. The Court has found that no such relationship existed. Count IV also makes references to numerous contractual relationships with Clarkeies. Prior to the purchase of the Berlin and Woodsville stores, Clarkeies had a relationship with AGNE as its supplier and inventory financier for the Groveton and Colebrook stores. The evidence does not support a finding that AGNE breached any covenant of good faith and fair dealing with respect to these contractual arrangements. As a result of the purchase of the Berlin and Woodsville stores, AGNE also became the supplier and inventory financier of Clarkeies, and it also became its landlord through its subsidiary, Associated Lease Corp. The uncontroverted testimony was that AGNE assumed this latter position at the request of the seller and/or owners of the property. Clarkeies characterizes this leasing company as an entity lacking assets. This Court disagrees with that characterization because the leasehold interests themselves are assets and, in some instances, can be valuable assets. The Court finds that assuming the role of landlord is not a breach of any covenant of good faith or fair dealing.

■ While not referred to in this court but mentioned in Count IX, some evidence was produced at the trial of AGNE's litigation in the superior court to enjoin the purported sales of the Colebrook and Groveton stores and to obtain possession of all of the stores alleging the assets were cross-collateralized. The cross-collateralization issue was subsequently tried before Judge Deasy of this Court, who found in his January 22, 2003, opinion that the assets of the Berlin and Woodsville stores secured all obligations to AGNE, but that the Colebrook and Groveton assets secured only the loans associated with these stores and the allonge referred to in the opinion. *See Clarkeies Market, L.L.C. v. Associated Grocers of New England, Inc.,* 2003 BNH 002, 2003 WL 193686 (Bankr. D.N.H.2003). Clarkeies, at trial, alleges that to bring the action in the New Hampshire superior court based on allegations of cross-collateralization was wrongful. Once again, this Court disagrees. There is no evidence that AGNE did not believe that cross-collateralization existed. Judge Deasy devoted over four pages of his opinion to just this issue. Consequently, this Court cannot find that commencing litigation in the superior court is a breach of any covenant of good faith and fair dealing. While the Court is on the subject of litigation in the New Hampshire superior court, Clarkeies also alleges that the enjoining of the sales of the Groveton and Colebrook stores was wrongful and in breach of the right of first refusal held by AGNE. While this issue was not fully litigated in this particular adversary proceeding, there is ample reason to question whether the purported purchase offer was a bona fide offer to which AGNE had to respond. Count IV is denied.

The next three counts sound in negligence. Count V alleges damages arising out of the negligent provision of brokerage services. This Court has found that an agency brokerage relationship did not exist and, thus, Count V is denied.

■ Count VI is for negligent misrepresentation. While the pleadings are not specific as to the alleged misrepresentation, testimony and evidence produced at trial on behalf of Clarkeies leads the Court to believe that they were two-fold. First, Clarkeies alleges that AGNE represented that the two stores were "good" stores or "viable" stores. Clarkeies further asserts that since AGNE knew that Clarkeies did not want to jeopardize the Colebrook and Groveton stores, these representations equated to a guaranty by AGNE that the stores would be profitable with positive cash flow. The second representation that Clarkeies alleges as being negligent is based on income and cash flow pro formas shown to Mr. Clarke at the meeting in Bretton Woods. This representation is alleged as negligent because it was based on the 1997 sales for the Berlin store, and AGNE had also internally prepared a cash flow based on a $500,000 decrease in sales in Berlin, which was not shown to Mr. Clarke. This latter pro forma cash flow was an attempt to analyze the effect that the new Shaw's might have on the Berlin store. Clarkeies, in its request for rulings of law, cites to section 552 of the RESTATEMENT (SECOND) OF TORTS (1977) for the elements of the tort of negligent misrepresentation. An essential element of that tort is that AGNE supplied false information. The New Hampshire Supreme Court described a tort as follows, "American's claim of error is best approached by considering the basic elements of the tort: the defendant's misrepresentation of a material fact and the plaintiff's justifiable reliance on

that misrepresentation." *Hydraform Prods. Corp. v. Am. Steel & Aluminum Corp.,* 127 N.H. 187, 200, 498 A.2d 339 (1985). Not only must there be a false representation, but there must be justifiable reliance.

■ It is Clarkeies' reasoning that because AGNE knew that Clarkeies wanted the Berlin and Woodsville stores to stand on their own, AGNE's representation that these stores were "good" stores or "viable" stores was a guaranty of their future profitability and thus a misrepresentation when subsequently the stores proved not to be the case. This Court does not agree. First, there is no evidence that the stores were not viable or good at the time the statements were made. This was a business transaction between Clarkeies, AGNE and Kelley. There are risks associated with any business transaction. Clarkeies elected to purchase the stores and inventory with no up-front investment, utilizing 100% financing for both the stores and the inventory. It is patently unreasonable to think that anyone would guarantee the success of this type of a business venture especially when the venture was not its own. There are so many variables which might affect profitability, some external and not in Clarkeies' control, such as the Berlin economy and competition, and some controlled by Clarkeies, such as changes in management, employee problems, improvements to a particular store and monetary withdrawals by the members of Clarkeies. Evidence of all of these types of issues was presented at trial by AGNE. Finally, it was not in AGNE's interest to pursue a venture that was not viable since it financed the inventory, became the prime lessor, and guaranteed Clarkeies' obligations to Kelley. The upside for AGNE was the ability to continue to supply all of Clarkeies' stores in the future.

The second matter identified by Clarkeies as grounds for a finding of negligent misrepresentation concerns the pro forma income statements and cash flows prepared by AGNE for the Berlin and Woodsville stores. These documents were prepared by AGNE from information supplied by Kelley in the summer of 1998, apparently for internal purposes. It is Mr. Clarke's testimony that they were shown to him at the August 17, 1998, meeting in Bretton Woods. (Pl.'s Exs. 19 and 20.) Although another statement was prepared for the Berlin store (Pl.'s Ex. 27) with the assumption that the sales decreased by $500,000, it was apparently not shown to Mr. Clarke. Mr. Clarke did not retain a copy of these documents. As to the pro formas shown to Mr. Clarke, Clarkeies, through its expert, Mr. Maloney, asserts that they were not accurate and overstated the cash flow available to Clarkeies. In an effort to show the accuracy of the above-mentioned pro formas, AGNE produced the reports of Stephen Felder, a CPA, and Gordon Associates, Inc., a business valuation and financial consulting firm. Maloney did not create his own cash flow but basically used the Felder report to which adjustments were made, including a tax analysis, both on the Clarkeies level and the Clarkes' personal level. Needless to say, the experts disagreed in this analysis, including on which years they should base the pro formas for the Berlin store. It is interesting to note that, while the differences in projected cash flows were substantial, they all resulted in positive cash flow. Considerable time was taken at trial in the examination and cross-examination of these witnesses and their reports. The Court believes they missed the point.

The issue before the Court is not which of the experts' testimony constitutes the most accurate pro forma, but whether the AGNE pro formas, when they were prepared or shown to Mr. Clarke, constituted a basis for a finding of negligent misrepresentation. This Court believes they did not. First, pro formas are, by definition, projections of what might happen in the future based on assumptions usually related to past performance. There is no evidence that the information provided by Kelley and used by AGNE was not accurate. The pro formas were prepared prior to an agreement on the final figures as to the sales price, inventory financing and interest rates, which is clear on the face of the pro formas. The pro formas were shown to Mr. Clarke more than three months prior to the closing. There is no evidence that anyone from Clarkeies ever requested additional pro formas from AGNE. Subsequent to the Bretton Woods meeting, Mr. Clarke requested and received financial information from Kelley through AGNE, including the weekly sales reports for both stores for the prior two years. Mr. Clarke was aware of the imminent opening of a Shaw's and had previously managed stores in the Berlin area. AGNE did not prepare Clarkeies' tax returns and, thus, the information necessary to do a tax analysis was not available to AGNE at the time the pro formas were prepared. While Mr. Clarke had provided pro formas in connection with the purchase of the Groveton and Colebrook stores, he apparently made no effort to prepare any pro formas in connection with the purchase of the Berlin and Woodsville stores. Finally, the evidence does not support a finding that AGNE knew or should have known that the pro formas were inaccurate when prepared and when shown to Mr. Clarke. The Court finds that to rely on these pro formas, produced prior to the finalization of the transaction, was not justifiable reliance. For all of the above reasons, the Court also finds that the failure to show Mr. Clarke the pro formas adjusted for a decline in sales does not constitute

negligent misrepresentation. Any assumption as to the effect Shaw's would have on the Berlin store would be no more than a guess and, thus, could not be justifiably relied upon. Count VI is denied.

■■■ The seventh count is entitled "Negligent Provision of Due Diligence." Clarkeies, in its request for findings of fact and rulings of law, does not specifically address this count. The record does not support a finding for Clarkeies on this count. There is no evidence of what standard should be applied in determining what constitutes due diligence as applied to this transaction. The testimony of Mr. Clarke is that he never specifically asked AGNE to perform due diligence. (Tr. Day 6 at 96.) His further testimony is that he never asked AGNE what due diligence it had done. (Tr. Day 6 at 101.) His testimony, in essence, was that he expected it would perform due diligence when they negotiated the transaction. This is insufficient to sustain a finding that AGNE was negligent in providing due diligence. Count VII is denied.

■■■ The last count that this Court will consider is Clarkeies' allegation that the claims of AGNE should be equitably subordinated, which is Count VIII. The Court's ability to subordinate a claim is provided for in 11 U.S.C. § 510(c):

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C.A. § 510(c) (West 2004). This principle originated in the case of *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done. By reason of the express provisions of s 2 these equitable powers are to be exercised on the allowance of claims, a conclusion which is fortified by s 57, sub. k, 11 U.S.C.A. s 93 sub. K. For certainly if, as provided in the latter section, a claim which has been allowed may be later "rejected in whole or in part, according to the equities of the case," disallowance or subordination in light of equitable considerations may originally be made.

*Pepper v. Litton,* 308 U.S. at 304–05, 60 S.Ct. 238. The court went on to further say, "in the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Id.* at 307–08, 60 S.Ct. 238. Under the Code and under the above case, for a claim to be equitable subordinated, some inequitable conduct by the creditor is required. In the instant case, Clarkeies asserts that AGNE was an insider in the sense that it had dominion and control over Clarkeies and thus was subject to a more rigorous standard. The evidence does not support such a finding. Mr. Clarke's own testimony is that he did not believe he was bound to purchase the stores until he executed the documents on the day of the closing. This is hardly a statement of one under the dominion or

control of AGNE. Second, there is insufficient evidence that subsequent to the closing, AGNE asserted any dominion or control over Clarkeies other than a business relationship as the landlord and inventory financier of Clarkeies. Count VIII is denied.

In Count IX, Clarkeies requests this Court to determine the amount, validity and priority of the claim and lien of AGNE. There was no evidence submitted at trial on this count. This count is better suited to be determined in the claims allowance process in the Clarkeies' Chapter 11 proceeding and, in some respect, has already been commenced. *See Clarkeies Market, L.L.C. v. Associated Grocers of New England, Inc.*, 2003 BNH 002, 2003 WL 193686 (Bankr.D.N.H.2003). Therefore, this Court defers ruling on Count IX to Judge Deasy, who is presiding over the case in chief.

### CONCLUSION

This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate final judgment consistent with this opinion.